[Cite as *State v. Knowles*, 2016-Ohio-8540.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 16AP-345 |
| v. | : | (C.P.C. No. 15CR-2699) |
| Brandon P. Knowles, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 30, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee. **Argued:** *Valerie Swanson*.

**On brief:** *Todd W. Barstow*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Brandon P. Knowles, appeals the April 19, 2016 judgment of the Franklin County Court of Common Pleas convicting him, following a bench trial, and imposing sentence. For the following reasons, we affirm appellant's conviction but reverse his sentence.

I. Facts and Procedural History

{¶ 2} Officer Aaron Getzinger testified that on May 25, 2015, at approximately 2:30 p.m., he was dispatched on a report of a possible shooting at the intersection of Wager and Columbus Streets in Columbus, Ohio. Approximately one-to-two minutes later, Officer Getzinger arrived in the area and found a car crashed into a fence at the intersection of South 18th and Columbus Streets. Officer Getzinger saw a person sitting in the driver's seat of the car and a woman seated near the car. Officer Getzinger

approached the woman, who appeared to be very distressed.  The woman told him that "she was in the car at the time of the accident, and that -- at the time of the shooting, that the guy in the car was her husband, * * * that her husband was shot by a male known to her as Brandon."  (Tr. Vol. III at 19-20.)

{¶ 3}  Michael D. Williams testified that he owns a residential rental property located on Wager Street ("the residence").  Approximately two-to-three weeks before May 25, 2015, Michael went with his brother, Jerome, to perform work on the residence. When they arrived, Michael found appellant in the residence with a group of people. Michael testified he had not given appellant permission to be in the residence and told appellant and the other people to leave, which they did.  Approximately two weeks later, Michael saw appellant riding his bike.  Michael told appellant he had just installed a furnace and hot water tank in the residence, and offered appellant $20 if he would watch the residence to make sure those items were not stolen.  Appellant then began staying at the residence.

{¶ 4}  Michael testified that on May 25, 2015, he and his brother, Edward, went to the residence to check on it.  Around 2:00 p.m., Michael saw appellant outside the residence talking to "an older black guy" in a car.  (Tr. Vol. III at 44.)  Michael said he exchanged pleasantries with the man in the car as he left the residence.  Michael also observed a woman sitting in the passenger seat of the car.

{¶ 5}  Michael testified that a neighbor who lived across the street from the residence had a surveillance camera that could record the front of the residence.  Viewing the footage from the surveillance camera at trial, Michael was able to identify himself, his brother, and appellant in the recording.  The recording showed appellant outside the residence approaching a black car.

{¶ 6}  Edward Williams testified that on May 25, 2015, he went with Michael to the residence.  While he was in front of the residence, a car pulled up and the driver asked Edward to go get appellant.  Edward found appellant and brought him outside.  Later, when Edward was preparing to leave with Michael, he overheard the driver of the car say to appellant: "[Y]eah, I've got 20 for you now, and I've got the rest -- have the rest for you later, or something like that." (Tr. Vol. IV at 19.)  Edward stated the conversation between the car's driver and appellant was "pretty calm" and he "didn't think anything of it." (Tr.

Vol. IV at 20.) Edward then left the area with Michael until later that day. When Edward returned, he observed the same car whose driver had been conversing with appellant was "on the side of the road, on the stop sign, ran into a stop sign or a wall." (Tr. Vol. IV at 22.)

{¶ 7} Ta-Nikka Fly testified that on May 25, 2015, she and her husband, Walter Fly, drove to the residence to see appellant. At the time, Ta-Nikka and Walter were homeless and living out of their car. When they arrived at the residence, Walter asked someone to get appellant to come outside. Once appellant came outside, Walter and appellant had a conversation about "some pills, something about $23, and that was just the sum of it." (Tr. Vol. IV at 97-98.) When asked to clarify, Ta-Nikka said that Walter owed appellant $23 because "[s]omething about the pills wasn't what they were supposed to be. I don't know." (Tr. Vol. IV at 98.) However, Walter either did not have the money or did not give money to appellant. On cross-examination, Ta-Nikka stated that "[a]ll I know is he said he owed him $23. That's all I remember out of that conversation." (Tr. Vol. IV at 127.) Ta-Nikka also confirmed she previously told police that the incident involved "the sale of some bogus pills." (Tr. Vol. IV at 127.)

{¶ 8} Ta-Nikka stated that the conversation about money lased for only a few minutes and that afterward appellant and Walter were laughing and getting along. While appellant and Walter were talking, Ta-Nikka saw a person she knew as "Tjuan" in the area and greeted him. (Tr. Vol. IV at 100.)

{¶ 9} Walter asked to use appellant's phone, and appellant went back inside the residence. Ta-Nikka believed at the time that appellant was going to the residence to get a phone. When appellant came back outside from the residence, Ta-Nikka heard appellant say "[g]ive it up." (Tr. Vol. IV at 104.) Ta-Nikka then heard a single shot. She turned to look in the direction the shot came from and saw appellant standing within five feet of the car, pointing a gun at Walter. Walter turned to Ta-Nikka and said "[h]e shot me, babe." Ta-Nikka told Walter to "[p]ull off," and Walter drove the car away. (Tr. Vol. IV at 107.) At trial, Ta-Nikka stated that she heard another shot as they were driving away. On cross-examination, Ta-Nikka confirmed that she originally told responding officers that she heard only a single shot.

{¶ 10} Ta-Nikka grabbed the steering wheel because she saw Walter's "eyes rolling in the back [of] his head." (Tr. Vol. IV at 107.) Ta-Nikka was unable to completely control the car because Walter was pressing the car's accelerator and trying to turn the wheel. Ta-Nikka was also ducking while she tried to steer because she was scared of being shot herself. Ta-Nikka hit two or three parked cars and then aimed the car into a fence in order to stop it. The car stopped and Ta-Nikka tried to administer CPR to Walter who was gasping for air. Ta-Nikka was "screaming [and] scared." (Tr. Vol. IV at 108.) Despite Ta-Nikka's efforts, Walter died.

{¶ 11} Ta-Nikka stayed in the car for a minute "because I was trying to save my husband, and I just was in shock." (Tr. Vol. IV at 109.) People in the area came to assist her and helped her out of the car. Ta-Nikka sat down on a nearby porch until police officers arrived. Ta-Nikka spoke to police and identified appellant as her husband's killer. She later selected appellant's picture in a photo array.

{¶ 12} On May 25, 2015, Antjuan Washington was riding his bike near Columbus and Wager Streets when he saw appellant speaking with Walter. He did not hear what they were talking about, but did hear two gunshots. After he heard the gunshots, he saw Walter's car driving away and appellant walking away in the opposite direction. Washington was later interviewed by a detective.

{¶ 13} At trial, Washington testified that he is friends with appellant. Washington also stated he did not want to testify and that he was brought to appellant's trial by a detective. Washington knew Walter, whom he knew as "Mr. Fly" or "JD." (Tr. Vol. IV at 72.)

{¶ 14} Washington stated that he did not see appellant with a gun when he heard gunshots. However, when Washington was asked the following: "You heard gunshots. You turned around, and you saw [appellant] with the gun pulling it down. Isn't that what you told the detective," Washington responded: "I mean, shit, yeah." (Tr. Vol. IV at 78-79.) Washington testified that he felt pressured by the detective who interviewed him after the shooting. Washington admitted that his testimony at trial was different from what he told the detective after the shooting.

{¶ 15} Lena Brown testified that she lived across the street from the residence where appellant was staying. Brown's house had surveillance cameras that recorded all

the time. Brown was familiar with appellant and a person she knew as "Antjuan" from interactions in the neighborhood. On May 25, 2015, Brown arrived home around 1:00 p.m. Brown stated she saw appellant standing outside the residence near the driver's side of a car talking to people in the car. The car started to move away and then stopped. Brown heard two gunshots and then saw the car drive down East Columbus Street. When she heard the shots, Brown saw appellant in the street and Antjuan riding nearby on a bike. Brown did not see whether appellant or Antjuan had a gun. Brown believed that appellant was the one who fired the shots. Brown called police and provided them with surveillance footage from her house.

{¶ 16} The parties stipulated to a report prepared by Dr. Donald Pojman of the Franklin County Coroner's Office. The coroner's report ruled that Walter's death was a homicide and the cause of death was a gunshot wound to the chest. The projectile, a .45 caliber bullet, entered Walter's body on his left side and traveled to his right arm.

{¶ 17} Detective Larry Shoaf of the Columbus Police Crime Scene Search Unit, testified that, on May 25, 2015, he responded to two crime scenes. One scene was located at a vehicle crash site near the intersection of East Columbus and South 18th Streets, and the other scene was two blocks to the east near the residence. At the vehicle crash scene, Detective Shoaf found lead fragments from a projectile on the driver's seat, passenger's seat, and on the ground outside the passenger's side of the car. Detective Shoaf found two spent .45 caliber shell casings near the residence. According to Detective Shoaf, one shot which originated "outside behind where the driver would be [sitting]" traveled through the inside of the car heading out "towards the front passenger side quarter panel area." (Tr. Vol. IV at 61-62.)

{¶ 18} At trial, the parties stipulated to appellant's prior conviction for attempted burglary, a felony of the third degree, and three juvenile adjudications for robbery, burglary, and aggravated assault.

{¶ 19} On June 3, 2015, a Franklin County Grand Jury filed an indictment charging appellant with three criminal counts: murder, in violation of R.C. 2903.02, an unclassified felony, felonious assault, in violation of R.C. 2903.11, a felony of the second degree, and having weapons while under disability, in violation of R.C. 2923.13, a felony

of the third degree.  The counts of murder and felonious assault both included a firearm specification pursuant to R.C. 2941.145(A).

{¶ 20} On April 4, 2016, appellant waived his right to trial by jury.  On April 5, 2016, a bench trial commenced.  On April 6, 2016, the trial court found appellant guilty on all counts and specifications and proceeded to hold a sentencing hearing.  The trial court sentenced appellant to 15 years to life for murder, 5 years for felonious assault, and 3 years for the having weapons while under disability conviction.  The court also sentenced appellant to two 3-year sentences for the two firearm specifications.  The court ordered the sentences for murder and felonious assault to be served concurrently to each other. The court ordered all other sentences, including those for the firearm specifications, to be served consecutively, resulting in a total sentence of 24 years to life.  On April 7, 2016, the trial court filed a judgment entry.  On April 19, 2016, the trial court filed an amended judgment entry reflecting appellant's conviction and sentence.

## II.  Assignments of Error

{¶ 21} Appellant appeals and assigns the following two assignments of error for our review:

> I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF MURDER; FELONIOUS ASSAULT AND HAVING WEAPONS UNDER DISABILITY AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY SENTENCING HIM TO CONSECUTIVE TERMS OF INCARCERATION IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.

## III.  First Assignment of Error—Sufficiency and Manifest Weight

{¶ 22} In his first assignment of error, appellant asserts his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

**A. Sufficiency**

{¶ 23} Sufficiency of evidence is a "legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When judging the sufficiency of the evidence to support a criminal conviction, an appellate court must decide if, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.* Thus, viewing the evidence in a light most favorable to the prosecution, we consider whether any rational trier of fact could have found the essential elements of appellant's crimes proven beyond a reasonable doubt.

{¶ 24} Murder is defined in R.C. 2903.02(A), which provides, in pertinent part, that "[n]o person shall purposely cause the death of another." Felonious assault is defined in R.C. 2903.11(A)(2), which provides, in pertinent part, that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon." Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist."

{¶ 25} Having weapons while under disability is defined in R.C. 2923.13(A)(2), which provides, in pertinent part, as follows: "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person * * * has been convicted of any felony offense of violence." The firearm specification provided in R.C. 2941.145(A) permits imposition of a three-year mandatory prison term if "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." *See* R.C. 2929.14(B)(1)(a)(ii).

{¶ 26} We first consider appellant's conviction for murder with a firearm specification. Ta-Nikka testified that appellant was standing approximately five feet away from the car in which she and Walter were sitting when appellant fired two shots into the car. Ta-Nikka testified the first shot struck Walter, who ultimately died of the resulting injury. Minutes after Walter was shot and killed, Ta-Nikka told responding officers that "Brandon" shot Walter, and later selected appellant's picture from a photo array. (Tr. Vol. III at 20.)

{¶ 27} Moreover, additional evidence supported Ta-Nikka's testimony. Detective Shoaf testified that two .45 caliber shell casings were recovered near the residence. The coroner's report, to which the parties stipulated, classified appellant's death as a homicide and stated that the cause of death was a gunshot wound to the chest. Michael, Edward, Brown, and Washington all testified that appellant was talking to people in a car where the shooting occurred. Washington admitted he told police he heard gunshots and "saw [appellant] with the gun pulling it down." (Tr. Vol. IV at 78.) The surveillance video recorded at Brown's residence also supports the witnesses' testimonies tending to show that appellant shot Walter. Thus, viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence for the trial court to find appellant committed the offense of murder with a firearm specification. *See State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 28; *State v. Jackson*, 10th Dist. No. 14AP-748, 2015-Ohio-5114, ¶ 23 (finding the testimony of one witness, if believed, is sufficient to support a conviction).

{¶ 28} We next consider appellant's conviction for felonious assault with a firearm specification. We have previously held that an attempt to cause physical harm may be inferred from the act of firing a gun in the direction of a person. *State v. Thompson*, 10th Dist. No. 97APA04-489 (Nov. 10, 1997), citing *State Kline*, 11 Ohio App.3d 208 (6th Dist.1983) ("When appellant fired the gun in the direction of [the victim], he committed an overt act sufficient to support the finding that he knowingly attempted to cause physical harm."). *See also State v. Grisson*, 10th Dist. No. 08AP-952, 2009-Ohio-5709, ¶ 43, citing *State v. Phillips*, 75 Ohio App.3d 785, 792 (2d Dist.1991) ("Firing a weapon randomly in the direction of individuals who are arguably within range of the shooter is sufficient to demonstrate an attempt to cause physical harm."); *State v. Mills*, 62 Ohio

St.3d 357, 369 (1992) (finding evidence was sufficient to support defendant's felonious assault convictions involving persons in defendant's line of fire, but not sufficient to support a conviction if the person was not in line of fire); *State v. Gray*, 10th Dist. No. 04AP-938, 2005-Ohio-4563, ¶ 12.

{¶ 29} Here, as previously mentioned, the testimony supports that appellant fired two shots approximately five feet away from the car. One of those shots struck Walter, fatally injuring him. Ta-Nikka was sitting directly next to Walter in the passenger seat of the car. Ta-Nikka testified she was "looking in the barrel of a gun" when appellant fired into the car. (Tr. Vol. IV at 130.) As she attempted to drive away from the shooting, Ta-Nikka testified she was ducking because she was scared of being shot herself. Detective Shoaf described a bullet hole in the "front passenger side quarter panel area" of the windshield. (Tr. Vol. IV at 62.) Detective Shoaf also found projectile fragments on both the driver's and passenger's seat. Therefore, regardless of the fact that only Walter was shot, appellant's intent to cause physical harm to Ta-Nikka can be inferred based on appellant's act of firing multiple shots into the enclosed space of the car, where Ta-Nikka was seated directly next to Walter, placing her within the line of fire. *Grisson* at ¶ 44; *Gray* at ¶ 13. Thus, we find that the evidence, when viewed in a light most favorable to the prosecution, is sufficient to convict appellant of the offense of felonious assault with a firearm specification.

{¶ 30} Next, considering the foregoing evidence and appellant's stipulation to a prior felony conviction, we find that the evidence was sufficient to support appellant's conviction for having weapons while under disability. Therefore, we find that all of appellant's convictions were supported by sufficient evidence because, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. *Jenks* at paragraph two of the syllabus.

## B. Manifest Weight

{¶ 31} "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25.

*See also Thompkins* at 387 ("Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence.").  An appellate court must review the entire record, weighing the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). This authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' "  *Id.* at 387, quoting *Martin* at 175.

{¶ 32} "[A] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial."  *State v. Spires*, 10th Dist. No. 10AP-861, 2011-Ohio-3312, ¶ 18, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. The trier of fact is free to believe or disbelieve any or all of the testimony. *Id.*, citing *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio-1257.  In considering the credibility of the witnesses, a reviewing court is guided by the principle that the trier of fact is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the testimony.  *State v. Horton*, 10th Dist. No. 14AP-997, 2015-Ohio-4039, ¶ 25, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).  Thus, although an appellate court acts as a "thirteenth juror" in considering the weight of the evidence, it must give great deference to the fact finder's determination of witness credibility.  *Spires* at ¶ 18, citing *State v. Covington*, 10th Dist. No. 02AP-245, 2002-Ohio-7037, ¶ 22.

{¶ 33} First, appellant contends that the video recordings from Brown's surveillance cameras are "grainy and unfocused and, in order to be useful, had to be 'interpreted' by the State's witnesses at trial."  (Appellant's Brief at 2.)  Here, the trier of fact was aware of the quality of the recording and could weigh the evidence accordingly. Furthermore, appellant fails to point to any inconsistencies between the recording and the witnesses' testimonies that would render his conviction against the manifest weight of evidence.

{¶ 34} Second, appellant asserts that Ta-Nikka's testimony was not credible because she "insisted that she knew nothing about [Walter's] drug dealing. However, she and [Walter] were homeless and lived in a car. Keeping secrets in that type of living arrangement would be difficult at best." (Appellant's Brief at 3.) At trial, Ta-Nikka testified regarding her recollection of Walter's conversation with appellant. She also admitted that she told police that Walter and appellant were involved in a discussion about "bogus pills." (Tr. Vol. IV at 127.) The trier of fact was aware of Ta-Nikka's statements regarding the nature of Walter and appellant's interaction, and as such was in the best position to weigh Ta-Nikka's testimony in determining her credibility. *State v. Jackson*, 2015-Ohio-5114, at ¶ 24; *State v. Edmond*, 10th Dist. No. 15AP-574, 2016-Ohio-1034, ¶ 33; *Horton* at ¶ 25. Having reviewed the record, we cannot find that Ta-Nikka's testimony was inherently unreliable and unworthy of belief.

{¶ 35} Thus, considering the credibility of the witnesses and the evidence presented at trial, we cannot find that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Jackson*, 2015-Ohio-5114, at ¶ 25; *Thompkins* at 387. Accordingly, appellant's first assignment of error is overruled.

## IV. Second Assignment of Error—Consecutive Sentence Findings

{¶ 36} In his second assignment of error, appellant contends the trial court committed reversible error by failing to make findings sufficient to support the imposition of consecutive sentences.

{¶ 37} R.C. 2929.14(C)(4) provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16,

2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 38} Thus, pursuant to R.C. 2929.14(C)(4), in order to impose consecutive terms of imprisonment, the trial court is required to make at least three distinct findings: "(1) that consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the subsections (a), (b) or (c) applies." (Emphasis omitted.) *State v. Price*, 10th Dist. No. 13AP-1088, 2014-Ohio-4696, ¶ 31, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177. A trial court seeking to impose consecutive sentences must make the findings required by R.C. 2929.14(C)(4) at the sentencing hearing and also incorporate such findings into its sentencing entry. *Bonnell* at ¶ 37. However, the trial court need not state reasons to support its findings, nor is the court "required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id. See also State v. Ayers*, 10th Dist. No. 13AP-371, 2014-Ohio-276, ¶ 12. A "word-for-word recitation of the language of the statute is not required," but where "the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29.

{¶ 39} Because appellant failed to object to the imposition of consecutive sentences at the sentencing hearing, our review is limited to consideration of whether the trial court committed plain error. *Jackson*, 2015-Ohio-5114, at ¶ 30, citing *Ayers* at ¶ 7. Under Crim.R. 52(B), " '[p]lain errors or defects affecting substantial rights may be noticed

although they were not brought to the attention of the court.' 'To constitute plain error, the error must be obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection.' " *State v. Jones*, 10th Dist. No. 14AP-80, 2014-Ohio-3740, ¶ 11, quoting *State v. Gullick*, 10th Dist. No. 13AP-26, 2013-Ohio-3342, ¶ 3, citing *State v. Tichon*, 102 Ohio App.3d 758, 767 (9th Dist.1995).

{¶ 40} Plaintiff-appellee, State of Ohio, contends that we cannot find error where there "is no probability of a different outcome." (Appellee's Brief at 29.) As the state acknowledges, however, "[w]e have previously found that when the record demonstrates that the trial court failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences on multiple offenses, 'appellant's sentence is contrary to law and constitutes plain error.' " *Ayers* at ¶ 15, quoting *State v. Wilson*, 10th Dist. No. 12AP-551, 2013-Ohio-1520, ¶ 18.

{¶ 41} Therefore, in determining compliance with R.C. 2929.14(C)(4), we examine whether: (1) the trial court engaged in the correct analysis, and (2) the record contains evidence to support the findings of the trial court. *State v. Dennison*, 10th Dist. No. 14AP-486, 2015-Ohio-1135, ¶ 18, citing *Bonnell* at ¶ 29. Here, with regard to its sentencing decision, the trial court stated the following:

> [The Court]: The Court at this time after reviewing the matters in this case will impose on the Murder charge -- and I really don't have anything to add other than in reviewing your record, [appellant], you've had opportunities starting as a juvenile, and even before this Court previously you were placed on Community Control.
>
> Now, I will say -- and one of the things that I did -- I had you come back to see me a couple of times during the course of that to insure that you were, what we felt was, in compliance, but, obviously, with this incident, you were not totally in compliance with what you were supposed to be doing.
>
> * * *
>
> Without a doubt * * *, you will spend more than 24 years in prison in all likelihood. You're a young man. * * * I hope that you use your time to try [to] find out where you should be. Certainly what you've done is a horrendous crime, and the minimum you should pay is 24 to life.

* * *

[Assistant Prosecutor]: I would just ask the Court make [its] findings of why you found the Weapon Under Disability and imposed consecutive sentences. I think we just need it for the record.

[The Court]: The Court imposed the consecutive sentence on the Weapon Under Disability because this gentleman was on probation to the Court, and the Court feels that in order to protect it's necessary that a consecutive sentence be imposed.

(Tr. V(A) at 233-36.)

{¶ 42} In the April 19, 2016 judgment entry, the trial court stated the following:

Consecutive sentences are imposed here because it is necessary to protect the public from future crimes or to punish the offender. The offender committed one or more of the multiple offenses while under community control. The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

(Emphasis omitted.) (Amended Jgmt. Entry at 2.)

{¶ 43} We first consider whether the trial court made a finding that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. *Dennison* at ¶ 19; *Price* at ¶ 36-38. After thoroughly reviewing the record of the sentencing hearing, we cannot discern whether the trial court made the required proportionality finding. In so concluding, we recognize that the trial court need not engage in a talismanic recitation of the statutory language. *Bonnell* at ¶ 37. However, where a reviewing court cannot discern from the record whether or not the trial court engaged in the correct analysis, the trial court's imposition of consecutive sentences cannot be upheld. *Id.* at ¶ 29.

{¶ 44} In this case, we cannot discern from the record whether the trial court considered whether consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public as required by R.C. 2929.14(C)(4). Therefore, we find that the trial court failed to make the findings required by R.C. 2929.14(C)(4) at the sentencing hearing. This conclusion is supported by the trial court's failure to journalize findings regarding the proportionality analysis into the sentencing entry. *State v. Williams*, 10th Dist. No. 13AP-552, 2013-Ohio-4891, ¶ 6,

citing *State v. Miller*, 127 Ohio St.3d 407, 2010-Ohio-5705, ¶ 12 ("It is a well-settled rule that a court speaks through its journal entries."); *Bonnell* at ¶ 30 ("A trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law."); *Dennison* at ¶ 21; *Jackson*, 2015-Ohio-5114, at ¶ 32.

{¶ 45} The state urges us to find that the trial court engaged in the proper analysis because it noted that "what you've done is a horrendous crime, and the minimum you should pay is 24 to life." (Tr. Vol. V(A) at 235.) Additionally, the state points to the trial court's statement that it "imposed the consecutive sentence on the Weapon Under Disability because this gentleman was on probation to the Court, and the Court feels that in order to protect it's necessary that a consecutive sentence be imposed." (Tr. Vol. V(A) at 236.)

{¶ 46} In *Bonnell*, the Supreme Court of Ohio stated:

> We can discern from the trial court's statement that Bonnell had "shown very little respect for society and the rules of society" that it found a need to protect the public from future crime or to punish Bonnell. We also can conclude that the court found that Bonnell's "atrocious" record related to a history of criminal conduct that demonstrated the need for consecutive sentences to protect the public from future crime. But it never addressed the *proportionality* of consecutive sentences to the seriousness of Bonnell's conduct and the danger he posed to the public, which in this case involved an aggregate sentence of eight years and five months in prison for taking $117 in change from vending machines.

(Emphasis added.) *Id.* at ¶ 33. The court concluded that the trial court's "description of Bonnell's criminal record as atrocious and its notation of his lack of respect for society do not permit us to conclude that the trial court had made the mandated statutory findings in accordance with R.C. 2929.14(C)(4)." *Id.* at ¶ 34. Consistent with *Bonnell*, we cannot discern from the trial court's statements that it made the proportionality finding required by R.C. 2929.14(C)(4).

{¶ 47} Therefore, because the record reflects that the " 'trial court failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences on multiple offenses, "appellant's sentence is contrary to law and constitutes plain error." ' " *State v. J.H.S.*, 10th Dist. No. 14AP-399, 2015-Ohio-254, ¶ 17, quoting *Ayers* at ¶ 15,

quoting *Wilson*, 2013-Ohio-1520, at ¶ 18. Finally, as we have determined the trial court erred by failing to make the required proportionality finding, we need not consider whether the trial court made the other findings required by R.C. 2929.14(C)(4). Accordingly, we sustain appellant's second assignment of error and remand this matter to the trial court for it " 'to consider whether consecutive sentences are appropriate, pursuant to R.C. 2929.14(C)(4), and, if so, to make the proper findings on the record at the sentencing hearing and incorporate those findings into its sentencing entry.' " *J.H.S.* at ¶ 18, quoting *Jones* at ¶ 18, citing *Bonnell*.

## V. Conclusion

{¶ 48} Having overruled appellant's first assignment of error and sustained appellant's second assignment of error, we affirm appellant's conviction but reverse his sentence and remand to the Franklin County Court of Common Pleas for resentencing in accordance with law and consistent with this decision and R.C. 2929.14(C)(4).

*Judgment affirmed in part,*
*reversed in part,*
*and cause remanded with instructions.*

TYACK and LUPER SCHUSTER, JJ., concur.

———————