[Cite as *State v. Petty*, 2017-Ohio-1062.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-950 |
| | | (C.P.C. No. 14CR-3744) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Mathias D. Petty, | : | |
| Defendant-Appellant. | : | |

---

# D E C I S I O N

### Rendered on March 23, 2017

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert*.

**On brief:** *The Hemminger Law Firm, LLC*, and *Chad K. Hemminger*, for appellant. **Argued:** *Chad K. Hemminger*.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} Defendant-appellant, Mathias D. Petty, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding him guilty of rape and importuning.

{¶ 2} On July 16, 2014, appellant was indicted on one count of rape, in violation of R.C. 2907.02, and one count of importuning, in violation of R.C. 2907.07(A). The rape count included a repeat violent offender specification.

{¶ 3} The jury trial began June 2, 2015. At trial, C.A., the alleged victim, testified she began using the Badoo app on June 10, 2014. According to C.A., people use the app "to meet people." (Tr. Vol. II at 174.) A user is supposed to be 18 or older, requiring the user to click a button indicating, "Yes, I'm 18." (Tr. Vol. II at 175.)

{¶ 4} In July 2014, C.A. began communicating through the Badoo app with a particular individual whose screen name was "T-h-a-i." They began talking about "[g]iving head, sex, stuff that shouldn't have been talking about." (Tr. Vol. II at 178.) C.A. did not tell this individual how old she was, and C.A. did not know the age of the other individual. C.A. testified that Thai first brought up the topic of oral sex on the app.

{¶ 5} On July 5, 2014, C.A. and her mother went to the residence of C.A.'s aunt, located "[d]own the street," approximately ten minutes walking distance from their home. (Tr. Vol. II at 180.) Other family members and friends were at the residence.

{¶ 6} C.A. and Thai were sending each other messages that evening. Later that evening, C.A. went outside "[b]ecause that person texted me saying, Oh, I want to come over, and I said okay." (Tr. Vol. II at 183.) In response to the nature of the messages, C.A. testified "[h]e was asking me the address. He was asking me if I was going to do it then. I needed to do it, and if I wasn't, then he doesn't have to come." She defined "it" as he wanted her to "[p]erform oral sex." (Tr. Vol. II at 184.)

{¶ 7} At trial, C.A. identified appellant as Thai. Thai arrived at the address that evening and C.A. described the events, as follows:

> I sat there for a minute, and I was just texting. And he said,
> You look pretty occupied, and I said okay. * * * Then he said,
> If you're not going to do it, I can just leave. * * * I said okay,
> and I stopped texting. * * * He asked me if he wanted to - - if I
> was going to pull it out or if he was.

(Tr. Vol. II at 191.)

{¶ 8} C.A. testified that appellant was talking about "[h]is penis." He unzipped his pants. "He took it out, and I got down on my knees, and I started sucking - - I started giving oral sex." (Tr. Vol. II at 192.) C.A. put appellant's penis in her mouth. Appellant "was moving my head" with his hand. (Tr. Vol. II at 193.) C.A. was on the porch with him for "[t]en, fifteen minutes." (Tr. Vol. II at 198.)

{¶ 9} C.A. testified that her mother came outside and "started yelling." Her mother "was cussing a lot." (Tr. Vol. II at 193.) C.A. stood up and her mother "asked what was - - what did I just do, and I said, [n]othing. I wouldn't tell her the truth. And then she started getting louder, and then that's when everybody in the kitchen came outside." (Tr. Vol. II at 194.) When C.A. refused to talk to her mother, C.A. testified her mother "yelled, and she hit me." (Tr. Vol. II at 195.)

{¶ 10} C.A. stated that appellant "was cornered, because my cousin * * *, her boyfriend was standing on the steps, my mom - - I was standing on the side, my mom was in front of him, and he was - - his back - - he was near the banister." (Tr. Vol. II at 197.) Appellant then jumped over the banister, and he ran to his car across the street and drove away.

{¶ 11} Initially, C.A. told the responding officer that nothing had occurred. C.A. testified: "I wouldn't tell him the truth, but I don't remember what I said." She did not tell the truth because she did not want to deal with the consequences. (Tr. Vol. II at 202.) Later, at the hospital, C.A. told a detective what happened. C.A. picked appellant's photograph from an array and identified the individual as the person who appeared on the porch that evening.

{¶ 12} C.A. had never met appellant before that evening. When asked why she went along with appellant's wishes, C.A. stated she was scared. On cross-examination, C.A. stated that after appellant arrived, she texted with him for about five minutes before he came up to the porch.

{¶ 13} Columbus Police Officer David Schulz testified that on July 5, 2014, at approximately 11:30 p.m., he received a dispatch regarding a reported sexual assault of a minor. Officer Schulz met with the mother, L.A., who was "frustrated, upset, and just distraught all around." (Tr. Vol. II at 79.) The incident had taken place down the street, approximately less than a quarter of a mile. After speaking with L.A., Officer Schulz then drove to C.A.'s aunt's house, where he spoke with C.A. C.A. initially denied anything wrong had occurred.

{¶ 14} After speaking with C.A., Officer Schulz then spoke a second time with L.A. and L.A. gave the officer her daughter's phone. The officer was able to view some messages and learned that the daughter had used a message service through an app identified as "Badoo." (Tr. Vol. II at 83.)

{¶ 15} Defense counsel objected to the officer testifying regarding the content of the text messages and the trial court overruled the objection. Officer Schulz testified that the messages were "trying to establish a basic contact and, specifically for that day, trying to set up a meeting day or meeting time and place between [C.A.] and the other individual." (Tr. Vol. II at 86.) After viewing the messages, Officer Schulz then spoke again with C.A., and she told him what happened on the porch.

{¶ 16} Officer Schulz testified that C.A.'s family friend provided the name of suspect Mathias Petty by linking the Badoo account to a linked Instagram account to a linked Facebook account. Officer Schulz returned the phone to L.A.

{¶ 17} On cross-examination, Officer Schulz testified that L.A. indicated that her daughter became acquainted with appellant through the Badoo app. The officer did not keep the phone as evidence. The officer acknowledged there was a difference in the story from the version L.A. provided and the initial version C.A. provided. C.A. gave a different statement the second time Officer Schulz spoke with her.

{¶ 18} During Officer Schulz's direct examination, defense counsel objected to the testimony regarding the text messages based on hearsay. The transcript indicates that most of defense counsel's explanation regarding the objection is inaudible. After Officer Schulz testified, appellant again objected and the trial court overruled the objection.

{¶ 19} L.A. also testified. C.A. was 12 years of age in July 2014. L.A.'s sister, T.S., who is C.A's aunt, lived down the street. On July 5, 2014, L.A. and C.A. went to T.S.'s residence to socialize. Most of the individuals were at the dining room table playing cards, and C.A. went outside to sit on the front porch.

{¶ 20} Later, L.A. went to the front door to check on C.A. L.A. testified that when she looked out the front door, "I saw my daughter kneeled down on her knees. There was a comforter under her knees, and I saw a person standing in front of her holding something in his hand." (Tr. Vol. III at 275.) She stated the person was a man and "[h]e had long, dirty, scraggly hair." (Tr. Vol. III at 276.) At trial, L.A. identified appellant as the individual she observed on the porch that evening. L.A. testified she observed "my daughter performing oral sex on him." (Tr. Vol. III at 277.) She saw his penis, and observed appellant zip up his pants.

{¶ 21} L.A. testified that she opened the door and yelled at appellant. As she walked outside, appellant backed up against the banister and zipped up his pants. L.A. positioned herself near the stairs in order to prevent him from leaving. L.A. struck C.A. and pushed appellant against the house; she tried to obtain whatever was in his hand, whether a cell phone or wallet because she wanted to know his name. As she reached for it, he snatched it away and pushed her; appellant vaulted over the banister and ran to a car parked across the street.

{¶ 22} Inside the house, C.A. denied everything, but eventually told L.A. what happened. L.A. then phoned police and took C.A. to Nationwide Children's Hospital ("Children's"). L.A. spoke with detectives at the hospital. The officers showed her a photo array and she picked out an individual from the array. Some of her family members were able to use the app and obtain the identity of the individual. They gave the name to a police officer that night, and showed the officer text messages from C.A.'s phone.

{¶ 23} On cross-examination, L.A. testified that when she looked out the door appellant "was facing me." (Tr. Vol. III at 307.) When asked whether she told police that appellant's back was to the door, L.A. stated: "His back was to the door once we came - - once I came out and was on the porch." (Tr. Vol. III at 308.) According to L.A., "[h]is back was not to me when I came out outside." (Tr. Vol. III at 309.) L.A. stated she "did see the details of his face * * * his penis, and [C.A.] performing oral sex." (Tr. Vol. III at 310-11.)

{¶ 24} Lauren Moore is a master's level social worker at Children's and is a formally trained forensic interviewer. Her department deals with alleged sexual and physical abuse of children in the emergency department as well as medical trauma. On July 6, 2014, Moore met and interviewed C.A. at the hospital. C.A. told Moore that she put his "thing" in her mouth, later clarified as his penis, and C.A. started "sucking on - - sucking it." (Tr. Vol. III, 365, 369.)

{¶ 25} Lindsay Eckles Hoffman, a sexual assault nurse examiner with Children's, identified State's exhibit C as the hospital medical records for C.A. Hoffman testified that C.A. told her: "So she said that - - so just on here, it's oral contact, and patient's mouth to assailant's genitals." (Tr. Vol. IV at 406.) Hoffman performed a mouth swab of C.A. for any potential DNA evidence. C.A. denied any history of ejaculation.

{¶ 26} Hallie Garofalo is a forensic scientist in the DNA unit of the Ohio Bureau of Criminal Identification and Investigation ("BCI"). BCI performed DNA testing on the rape kit collected in the instant case. Garofalo testified that no DNA foreign to C.A. was detected on the swabs. Garofalo testified that the results were not surprising "given that there was not ejaculation." (Tr. Vol. IV at 477.)

{¶ 27} The first witness for the defense was Steven Petty, appellant's father. Appellant was living at his father's residence at the time of the alleged incident. On July 5, 2014, Steven and his fiancée were visiting friends, and Steven returned home at

approximately 10:40 p.m.  Steven testified that he spoke with his son at approximately 11:25 p.m. that evening as appellant was leaving the house.  (Tr. Vol. IV at 662.)

{¶ 28} Robert Britt is a private investigator with Britt Investigative Services.  Britt testified that he attempted to "interview both the alleged victim and her mother and to drive the distances between the two residences that were involved and take some photographs." (Tr. Vol. V at 701-02.)  He was unable to make contact with either of those individuals.  He took photographs of the scene and drove the distance from T.S.'s residence to Steven's residence.  Britt testified that it took him approximately 17 minutes to travel that distance.

{¶ 29} Appellant testified on his own behalf.  He started using the Badoo app which requires "at least one picture, a username, and an age."  Appellant "was looking for somebody to talk to. I was looking for a girl. I was on there for dating. I was on there for hooking up." (Tr. Vol. V at 719.)  Appellant "messaged back and forth on the Badoo" app with C.A. (Tr. Vol. V at 726.)  According to appellant, C.A.'s Badoo profile indicated she was 23 years of age.

{¶ 30} At first, the conversations were "[j]ust being flirty [a]nd it did lead to sexual conversations a lot."  Appellant denied knowing that C.A. was 12 years of age, especially based on their conversations.  At one point, C.A. "said, Do you want to hook up?  And I just responded with, What do you mean?" (Tr. Vol. V at 732.)  According to appellant, C.A. responded: "Are you trying to fuck or not? And I responded with, like, I don't really just jump into sex, but, like, I'm down to explore other things. I'm down to do other things.  And I meant, like, sexually, but not intercourse." (Tr. Vol. V at 733.)

{¶ 31} On July 5, 2014, C.A. "got a hold of me when she was done with her commitments and was, like, Yeah, you know, you can come over.  And she gave me her address." (Tr. Vol. V at 747.)  Appellant left his father's house at approximately 11:30 p.m.  Appellant testified: "I believe I had said, Are we going to do what we've been talking about all week?  And by that, I was referring to watching Orange is the New Black and cuddling up.  And, yeah, I do believe that we would have had some form of - - you know, some form of physicality during that." (Tr. Vol. V at 750.)

{¶ 32} Upon arriving, appellant texted C.A. again asking "[d]o you want to come out to the car? Because I was smoking. I didn't want to just walk up to the porch with a cigarette. Some people don't like that, you know." (Tr. Vol. V at 754.)

{¶ 33} Appellant testified that when he walked up to the porch, C.A. "was sitting in the chair with a blanket, like, on her lap, and she was just, like, in her phone." After "a few seconds," appellant "was, like, [t]his is the first time we meet in person, and you're glued to the phone? Like, sarcastically. And then she laughed about it and put the phone down." (Tr. Vol. V at 757.)

{¶ 34} Appellant then gave the following account of events:

> As I was saying, she was glued to her phone, and then she laughed and put her phone down. She kind of got, like, cute and flirty with me, and she was like, Do you want me to do it? And I was like, you know - - and she slid down from the chair onto the ground and was right - - I'm, like, right over - - I'm right beside her. She could reach out and touch me. You know what I mean?
>
> * * *
>
> She said those words and then did that, and I said, like, You're not even going to invite me inside?
>
> [S]he had grabbed onto the - - I believe it was my right pocket, like - - yeah, my right pocket, like, with her hand, just inside the front of my pocket. You know, and I wear kind of baggie clothes, so it's a baggie - - and she's, like, got her hand in my pocket, so I know what she's saying.
>
> And I say, You're not going to invite me inside? And she said, What's wrong with right here? We're alone. And I kind of, like - - I gave, like, this laugh * * *.

(Tr. Vol. V at 762-63.)

{¶ 35} Appellant further testified:

> [S]he's holding on to the - - my jeans right here and my pocket right here and is, like, I guess, this way, pulling on them, like, down, and I'm holding up my belt. And I remember this because I had just got a nice belt, and I'm holding on to my belt. And I say, You are crazy. Because I had just said - - she says, What's wrong with out here? We're alone. I'm like, You are crazy.
>
> And literally, right when that happens, right when we're in that position, an older woman, that I now know as [L.A.], comes out of the house and is like, What the fuck are you doing?

You know, and she looks at me, and I'm like, Is there some kind of a problem? I said, If there is, I don't want any trouble. If there's an issue, I can just leave.

She punches - - I can't say she punched. I can say that she hit [C.A.]. I don't know if it was open fist, closed fist, I have no idea, but she hit [C.A.] when [C.A.] responded to her.

Because after I said what I said, [C.A.] said, Mom, we're not doing anything. And, you know, I didn't - - her mom, Shut up.

And, you know, she grabbed me in my torso. I was closer to the banister after she had, like - - when she had come out and got to talking to us and everything, I'm closer to the rail. I said banister, but the rail.

And she grabs me by my torso and pulls me to the, like, the wall, right next to the chair. And when she does that, I'm like - - at this point I'm not comfortable, you know. I think that she - - I don't know if she's drunk. I don't know if she - - I don't know what's going on.

And so when she does that, I just - - I get out of the way of her and I get over that banister or rail right like that. It's a little bit of a drop. And I just go to my car. I'm, like, obviously this is a situation I don't want to be in.

(Tr. Vol. V at 764-65.)

{¶ 36} When asked about C.A.'s appearance on the porch, appellant testified:

I didn't see a difference in age appropriateness. I mean, she had something blocking her, so I couldn't - - and she was sitting down, so I couldn't see, like, her height or anything like that. But, no, I didn't see anything that shocked me, I didn't see - - I mean, she looked her age to me. She looked the age that she told me.

(Tr. Vol. V at 767.)

{¶ 37} When questioned whether he asked C.A. to perform oral sex that evening, appellant stated: "No, I didn't. We had talked about it over the phone. I don't know if I could say that it happened that day." (Tr. Vol. V at 768.) Appellant denied that his penis was ever exposed. He stated that C.A. "was lying" about performing oral sex on him. (Tr. Vol. V at 777.) He denied that L.A. said anything about C.A.'s age while he was on the porch. According to appellant, "I just thought I left the scene of a mom putting her hands

on her grown daughter.  You know what I mean?  I don't know if - - that's why I thought she might have been drunk, because just the way it happened.  It was like, what did she have to - - maybe she didn't get permission to invite me over.  I don't know if her mom still runs the household like that.  You know, I don't know those answers."  (Tr. Vol. V at 779.)

{¶ 38} Appellant acknowledged that "when I was 16 years old I was convicted of a robbery.  I was charged by the court and bound over as an adult and tried as an adult.  I pled guilty to that and received a four-year sentence in prison for robbery."  (Tr. Vol. V, 780.)

{¶ 39} On cross-examination, appellant testified he is 24 years of age and that he was previously convicted of robbery with a weapon.  He acknowledged that Badoo was an app used primarily for individuals to meet and engage in sexual activity.  He denied knowing that C.A. was not 23 years of age when he arrived at her aunt's house.  Appellant believed that Officer Schulz was "mistaken" about messages he observed on C.A.'s phone indicating that appellant was asking C.A. whether she was going to perform oral sex.  (Tr. Vol. V at 795.)  When asked what messages he sent to C.A., appellant testified: "I probably couldn't recall anything exactly, but I definitely was talking about how I would love to, you know, get head from her and that I would love to touch her, I would love to be inside her, things like that."  (Tr. Vol. V at 797.)  He acknowledged talking to C.A. about oral sex "that day."  When asked whether he solicited C.A. for oral sex, appellant responded: "I would say yes." (Tr. Vol. V at 799.)

{¶ 40} The jury found appellant guilty of Count 1 of the indictment, rape, in violation of R.C. 2907.02(A)(1)(b), and guilty of Count 2, importuning, in violation of R.C. 2907.07. The trial court found appellant guilty of the repeat violent offender specification. The trial court sentenced appellant to an indefinite term of 10 years to life imprisonment for rape, an additional consecutive 3 years for the repeat violent offender specification, and 24 months for importuning, with Counts 1 and 2 to be served consecutively to each other.

{¶ 41} On appeal, appellant sets forth the following four assignments of error for this court's review:

> [I.] The trial court erred in overruling Defendant-Appellant's objection and allowing the Plaintiff-Appellee's witnesses to testify about the hearsay contents of the written messages.

[II.] The trial court erred in denying Defendant-Appellant's motion for a judgment of acquittal as to the repeat violent offender specification on count one of the indictment due to the Plaintiff-Appellee's failure to present sufficient evidence to satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

[III.] Defendant-Appellant's convictions for all counts of the indictment were against the manifest weight of the evidence.

[IV.] Defendant-Appellant's aggregated prison sentence is clearly and convincingly contrary to law and/or the product of an abuse of discretion by the trial court.

{¶ 42} By his first assignment of error, appellant contends the trial court erred in overruling his objection and allowing Officer Schulz to testify regarding the contents of written messages he observed on C.A.'s phone. Appellant argues that the testimony should have been excluded on hearsay grounds and under the "best evidence rule."

{¶ 43} During Officer Schulz's testimony, defense counsel objected on hearsay grounds. After Officer Schulz testified, defense counsel stated the following on the record:

Yes, I wanted to speak concerning these - - the text messages or Badoo messages that were allegedly relayed between my client and the alleged victim.

One of the issues I have is, A, I do believe that it's hearsay; and, two, I do believe that they shouldn't be admissible, because it can't even be identified that those messages are even from my client.

I believe if you look it up, it's called, like, totem pole hearsay, where if you have an email message from somebody and you haven't verified that that email message is from them, we just think that, you know, there's a message, and we think that it might be him, but we have no clue whether that message was actually from him. That was just a guess.

And there's been no cell phone records or anything provided to suggest that those messages were from my client. And so I don't think that that should be admissible for that, and in the future. I don't think it should be admissible for future purposes.

(Tr. Vol. II at 155-56.)

{¶ 44} The prosecutor provided the following response:

> I think, first of all, I believe, if I understand the defense, it's that they had these communications and he showed up. So, first of all, to somehow suggest that it's not him is contrary to what the presented defense is going to be.
>
> In addition, what he's arguing goes to weight, not admissibility. That is for the jury to determine. The victim will be testifying about her communications and what she received. And, in fact, the communications and their conversations are one of the charges. So that is weight, not admissibility.

(Tr. Vol. II at 157.)

{¶ 45} Defense counsel responded:

> I think the identifying issue, the issue that I'm talking about, is a foundation. There's no foundation laid that the messages between them - - whether later my client reveals that or not, whether he testifies or not, it was never identified that that was even his message.
>
> It was, like, there was a message, and that was him, and he was saying we're meeting to have some oral sex.
>
> There was no foundation. I mean, that's just - - that's total hearsay. We don't know whose statements they are. And it's - - I believe the correct terminology is totem pole hearsay.
>
> And there's specific case law regarding emails, text messages, and verification of those to make sure that it is actually the person that is purported to be speaking. Because if it's going to come in under hearsay, it's going to come in under an admission; and if it's going to be an admission, you have to verify that it's my client making those statements.

(Tr. Vol. II at 158.)

{¶ 46} The trial court responded and ruled as follows:

> All right. I understand your argument, but I don't think the proper remedy for that is exclusion. I think it's good subject for cross-examination. And so any argument that the account wasn't linked to the Defendant and he just happened upon the porch on the same night that the messages indicate, let's meet this night, this time, what have you - - I haven't read the

> messages, as you both know. It's a proper subject for cross-
> examination.

(Tr. Vol. II at 159.)

{¶ 47} On appeal, appellant argues the trial court should have excluded evidence concerning the text messages on multiple grounds, including that (1) the content of the messages constituted hearsay within hearsay and should have been excluded under Evid.R. 805, (2) the messages lacked proper foundation because the witness lacked personal knowledge, pursuant to Evid.R. 602, and (3) the evidence should have been excluded under the best evidence rule pursuant to Evid.R. 1002.

{¶ 48} As noted, appellant objected during Officer Schulz's testimony, but parts of the transcript are marked as inaudible with respect to the supporting argument. The nature of the objection is hearsay based on an argument that the messages only showed one-half of the conversation between C.A. and appellant. Initially, we note these messages are not hearsay. Evid.R. 801(D)(2) provides that statements are not hearsay if: "[t]he statement is offered against a party and is (a) the party's own statement, in either an individual or a representative capacity." Here, appellant admitted he sent the text messages through the Badoo app and that he solicited C.A. Further, C.A. testified regarding the messages and she was subject to cross-examination.

{¶ 49} It was not until after Officer Schulz finished testifying that defense counsel articulated a lack-of-foundation objection. Such an objection, however, "must be 'contemporaneous' to the alleged error." *State v. Copley*, 10th Dist. No. 04AP-511, 2005-Ohio-896, ¶ 32, citing *State v. Murphy*, 91 Ohio St.3d 516, 532 (2001). Moreover, an objection on one ground does not preserve for appeal other grounds. *State v. Vu*, 10th Dist. No. 09AP-606, 2010-Ohio-4019, ¶ 30, citing *State v. Gulertekin*, 10th Dist. No. 97APA12-1607 (Dec. 3, 1998). Thus, appellant did not preserve an objection based on lack of foundation.

{¶ 50} On appeal, appellant appears to argue that his untimely lack-of-foundation objection includes an objection based on the best evidence rule. Appellant, however, made no objection based on the best evidence rule. Having failed to object on this ground, appellant waived all but plain error.

{¶ 51} Under Crim.R. 52(A), an appellate court may notice plain errors affecting substantial rights even though they were not brought to the attention of the trial court.

An alleged error constitutes plain error only if the error is obvious and, but for the error, the outcome of the trial clearly would have been different. *State v. Barnes,* 94 Ohio St.3d 21, 27 (2002). Notice of plain error is taken " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Id.,* quoting *State v. Long,* 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 52} Appellant appears to argue that the outcome of the trial would have been different because absent Officer Schulz's testimony regarding the messages, appellant would not have testified at trial. Appellant has failed to demonstrate plain error, as the testimony regarding the messages was admissible as a party-opponent admission. Further, appellant admitted he met C.A. through the Badoo app and that they exchanged messages. Appellant's trial counsel noted in opening statement that appellant sent the messages and arranged to meet C.A. C.A. also testified regarding the messages.

{¶ 53} Appellant argues that Officer Schulz did not have personal knowledge of the name of the application the two used for text messages, that he did not confirm the owner of the phone, and that he was told by a third party that appellant was a party to the text messages. Evid.R. 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Here, Officer Schulz testified to what he read on the phone, and the officer had personal knowledge regarding what he read. Further, appellant and his counsel admitted appellant sent the messages. On review, there is no plain error regarding a lack of foundation.

{¶ 54} Finally, appellant argues that the trial court should have excluded the testimony regarding the messages under the "best evidence rule." Evid.R. 1002 requires that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio." When there is other evidence sufficient to sustain a conviction, a best evidence error is harmless because the outcome of the proceedings would not be different. *State v. Salaam,* 1st Dist. No. C-150092, 2015-Ohio-4552, ¶ 11. If a defendant has not demonstrated prejudice, any violations of the best evidence rule do not require reversal. *State v. Rogan,* 94 Ohio App.3d 140, 163 (2d Dist.1994).

{¶ 55} Here, even assuming that admission of the testimony regarding the contents of the text messages violated the best evidence rule, any error in admitting that testimony was harmless. Appellant described the text messages and admitted he solicited C.A. In addition to Officer Schulz, C.A. testified regarding the messages, and both witnesses were subject to cross-examination. Even without the testimony regarding the messages and appellant's admission, C.A. testified that appellant solicited her when he arrived on the porch. Accordingly, appellant has failed to demonstrate plain error. Based on the foregoing, appellant's first assignment of error is overruled.

{¶ 56} By his second assignment of error, appellant contends the evidence was insufficient to establish the repeat violent offender specification attached to the rape count. Appellant argues there was a lack of sufficient probative evidence involving the use of force and, therefore, there was insufficient evidence to support the guilty verdict on the repeat violent offender specification.

{¶ 57} When a defendant challenges the sufficiency of the evidence, an appellate court " 'construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt.' " *State v. Watkins*, 10th Dist. No. 16AP-142, 2016-Ohio-8272, ¶ 31, quoting *State v. Hill*, 10th Dist. No. 07AP-889, 2008-Ohio-4257, ¶ 41. When an appellate court conducts such a review, it " 'does not engage in a determination of witness credibility, rather it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.' " *Id.*, quoting *Hill* at ¶ 41.

{¶ 58} According to R.C. 2929.01(CC), repeat violent offender means a person about whom both of the following apply:

> (1) The person is being sentenced for committing or for complicity in committing any of the following:
>
> (a) Aggravated murder, murder, any felony of the first or second degree that is an offense of violence, or an attempt to commit any of these offenses if the attempt is a felony of the first or second degree;
>
> (b) An offense under an existing or former law of this state, another state, or the United States that is or was substantially equivalent to an offense described in division (CC)(1)(a) of this section.

(2) The person previously was convicted of or pleaded guilty to an offense described in division (CC)(1)(a) or (b) of this section.

{¶ 59} We note that the parties stipulated to appellant's prior conviction of aggravated robbery. Appellant argues the evidence failed to demonstrate that the rape was an offense of violence. The term "offense of violence" is defined in R.C. 2901.01(A)(9) as a violation of a number of sections of the Ohio Revised Code, including R.C. 2907.02, rape. Thus, it is not necessary to prove that a rape was committed with violence in order to qualify as an offense of violence. *State v. Tayse*, 9th Dist. No. 23978, 2009-Ohio-1209, ¶ 32 ("Under Ohio law, such conduct [sexual conduct with another person who is less than 13 years of age] is defined as rape, an offense of violence."). Appellant's second assignment of error is overruled.

{¶ 60} By his third assignment of error, appellant contends that his convictions were against the manifest weight of the evidence. Under Ohio law, "[t]he weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other." *State v. Boone*, 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds* as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997). In considering a manifest weight challenge, "an appellate court may not merely substitute its view for that of the trier of fact." *Id.* The appellate court must "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Reversing a conviction as against the manifest weight of the evidence "must be exercised with caution," and such a reversal "is granted only in the most 'exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Brown*, 8th Dist. No. 98881, 2013-Ohio-2690, ¶ 27, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 61} R.C. 2907.02(A)(1) defines rape in part as follows: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies: * * * (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.07(A) defines importuning as follows: "No person shall solicit a person who is less than thirteen years

of age to engage in sexual activity with the offender, whether or not the offender knows the age of such person."

{¶ 62} Appellant argues that since there was conflicting testimony throughout the trial, the convictions for rape and importuning were against the manifest weight of the evidence. Appellant contends that the two different versions C.A. presented of the events, first denying anything improper occurred and then changing her story after L.A. hit her and influenced her story, impugn her credibility. Appellant also argues that L.A. presented conflicting testimony regarding whether or not appellant was facing her as she looked through the front door and stepped onto the porch. Further, appellant contends that the lack of DNA evidence and the failure of officers to obtain C.A.'s cell phone with the Badoo messages contribute to the fact that the evidence does not support the convictions. According to appellant, his testimony was consistent with C.A.'s original version of events.

{¶ 63} While there was conflicting testimony presented at trial, "an accused is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 29. The trier of fact, in this case, the jury, may take into consideration conflicting testimony from a witness in determining credibility and the persuasiveness of the account by either discounting or resolving the discrepancies. *State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 34, citing *Midstate Educators Credit Union, Inc. v. Werner*, 175 Ohio App.3d 288, 2008-Ohio-641 (10th Dist.). "The finder of fact at trial is in the best position to weigh the credibility of testimony by assessing the demeanor of the witnesses and the manner in which they testify, their connection or relationship with the parties, and their interest, if any, in the outcome. The finder of fact can accept all, part or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, and whether it is merely evidential or tends to prove the ultimate fact." *State v. Mullins*, 10th Dist. No. 16AP-236, 2016-Ohio-8347, ¶ 39.

{¶ 64} On review, there was sufficient, competent, credible evidence provided at trial to permit reasonable minds to find appellant guilty of both offenses. Appellant admitted that he solicited C.A. for oral sex. As to the rape charge, C.A. testified that in July 2014, she was 12 years of age. According to C.A., appellant unzipped his pants, "[h]e took it out, and I got down on my knees, and I started sucking - - I started giving oral sex."

(Tr. Vol. II at 192.) C.A. put his penis in her mouth. Appellant "was moving my head" with his hand. (Tr. Vol. II at 193.) C.A.'s mother also testified that she saw her daughter on her knees "performing oral sex on him" and identified appellant at trial as the man on the porch. She saw his penis. She also observed appellant zip up his pants.

{¶ 65} Appellant also contends that his conviction for the repeat violent offender specification is against the manifest weight of the evidence. Similar to his sufficiency argument, previously addressed under the second assignment of error, appellant contends there was a lack of sufficient probative evidence involving the use of force.

{¶ 66} Sufficiency of the evidence and manifest weight of the evidence are distinct concepts; they are "quantitatively and qualitatively different." *Thompkins* at 386. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 32 (1982). In order for an appellate court to reverse the judgment of a trial court on manifest weight grounds, the appellate court must unanimously disagree with the jury's resolution of the conflicting evidence. *Id.*

{¶ 67} In the second assignment of error, we determined that plaintiff-appellee, the State of Ohio, was not required to demonstrate violence as an element of rape in order to classify rape as an offense of violence for purposes of the repeat violent offender specification. "Offense of violence" is defined in R.C. 2901.01(A)(9), and includes 2907.02, rape, and 2911.01, aggravated robbery. Thus, appellant was convicted of a felony of the first degree that is an offense of violence (R.C. 2929.01(CC)(A)(1)(a)) and was previously convicted of a felony of the first degree that was an offense of violence (R.C. 2929.01(CC)(A)(2)); as such, he met the definition of a repeat violent offender.

{¶ 68} Based on this court's review of the record, we find that the jury could have reasonably believed the state's version of events. Furthermore, appellant admitted that he talked about oral sex with C.A. and that he solicited C.A. to perform oral sex on him. The state presented sufficient, competent, credible evidence to permit reasonable minds to find appellant guilty beyond a reasonable doubt of rape, importuning, and the repeat violent offender specification. We find the jury did not lose its way and create a manifest miscarriage of justice. Thus, the verdicts are not against the manifest weight of the evidence. Appellant's third assignment of error is overruled.

{¶ 69} By his fourth assignment of error, appellant contends that his aggregated prison sentence is clearly and convincingly contrary to law and/or the product of an abuse of discretion by the trial court. Appellant argues that his sentence is contrary to law because he was sentenced to an indefinite life sentence rather than a definite prison term for rape, the first-degree felony. Appellant also asserts that the trial court erred and violated R.C. 2941.25 by failing to merge Counts 1 and 2.

{¶ 70} The trial court imposed a sentence of ten years to life on the rape count. A conviction, pursuant to R.C. 2907.02(A)(1)(b), carries a mandatory prison term of ten years to life. R.C. 2907.02(B); 2971.03(B)(1)(a). R.C. 2907.02(B) provides that "an offender under division (A)(1)(b) of this section shall be sentenced to a prison term or term of life imprisonment pursuant to section 2971.03 of the Revised Code." Appellant argues that R.C. 2971.03 does not apply unless there is a violent sexual predator specification. While R.C. 2971.03(A) only applies to sexually violent predators, subsection (B) does apply to this case.

{¶ 71} R.C. 2971.03(B)(1) provides in relevant part: "[I]f a person is convicted of or pleads guilty to a violation of division (A)(1)(b) of section 2907.02 of the Revised Code committed on or after January 2, 2007, if division (A) of this section does not apply regarding the person, and if the court does not impose a sentence of life without parole * * * the court shall impose upon the person an indefinite prison term consisting of one of the following: (a) Except as otherwise required in division (B)(1)(b) or (c) of this section, a minimum term of ten years and a maximum term of life imprisonment." Here, the trial court noted that R.C. 2971.03(A) was inapplicable to this case and that it was not imposing a sentence of life without parole under R.C. 2907.02(B). Thus, the trial court was required to sentence appellant to a term of ten years to life. *See State v. Blankenship*, 145 Ohio St.3d 221, 2015-Ohio-4624, ¶ 25 ("If M.H. had been three years younger [12 years of age] Blankenship would have faced an indefinite prison term of a minimum of ten years to a maximum term of life.").

{¶ 72} Appellant also contends the trial court erred in not merging the rape and importuning counts pursuant to R.C. 2941.25. Appellant argues that since force was not involved, the importuning was a natural part of the rape because the offenses were committed with the same animus, or a desire for sex, and the harm from each offense was not separate and identifiable from the harm of the other offense.

{¶ 73} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 10, protect Ohio citizens from three abuses: "(1) 'a second prosecution for the same offense after acquittal,' (2) 'a second prosecution for the same offense after conviction,' and (3) 'multiple punishments for the same offense.' " *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794 (1989).

{¶ 74} The Supreme Court of Ohio clarified the determination of whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25 in *Ruff*. In paragraph one of the *Ruff* syllabus, the court stated: "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import." If any of the following is true, the offenses do not merge and the defendant may be convicted and sentenced for multiple offenses: "(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus.

{¶ 75} Further, "offenses are not allied offenses of similar import if they are not alike in their significance and their resulting harm." *Id.* at ¶ 21. The *Ruff* court held that "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23.

{¶ 76} In the present case, the trial court determined that the offenses of rape and importuning constituted offenses of dissimilar import, were committed separately, and were committed with a separate animus. The trial court noted that the importuning offense was entirely completed before the rape occurred.

{¶ 77} The two offenses in this case are based on separate conduct. R.C. 2907.07(A) defines importuning as "[n]o person shall solicit a person who is less than thirteen years of age to engage in sexual activity with the offender, whether or not the offender knows the age of such person." R.C. 2907.01(C) defines "sexual activity" as "sexual conduct or sexual contact, or both." R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh,

genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."  Ohio's Jury Instructions for importuning defines the solicitation element as follows:  "Solicited means to seek, to ask, to influence, to invite, to tempt, to lead on, or to bring pressure to bear."  2 *Ohio Jury Instructions*, Section 507.07(2) (2006).  "Thus, even in the absence of evidence that the defendant 'asked' the minor to engage in sexual activity, a defendant may still be found guilty of importuning under R.C. 2907.07 if there is evidence that the defendant sought, influenced, invited, tempted, led, or pressured the victim to engage in sexual activity." *State v. Kent*, 8th Dist. No. 98863, 2013-Ohio-2461, ¶ 14.  Appellant admitted he talked to C.A. about oral sex "that day" and he admitted that he solicited C.A. to perform oral sex on him.  (Tr. Vol. V at 799.)

{¶ 78} R.C. 2907.02(A)(1) defines rape as follows: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies:  * * * (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person."  Thus, appellant committed the rape when he engaged in sexual conduct with C.A.   The act of seeking, asking, influencing, inviting, tempting, or pressuring was complete before any sexual conduct or sexual contact occurred.

{¶ 79} Moreover, these two offenses involve separate harms and, therefore, are not allied offenses. The harm created from importuning is the asking, influencing or pressuring someone less than 13 years of age to engage in sexual conduct.  This results in harm even if no sexual conduct occurs.

{¶ 80}  Appellant argues that importuning requires in-person solicitation because R.C. 2907.07(C) provides that "[n]o person shall solicit another by means of a telecommunications device, as defined in section 2913.01 of the Revised Code, to engage in sexual activity with the offender when the offender is eighteen years of age or older and either of the following applies:  (1) The other person is less than thirteen years of age, and the offender knows that the other person is less than thirteen years of age or is reckless in that regard." Appellant argues that since he was not charged, pursuant to R.C. 2907.07(C), the only importuning at issue here is any which occurred on the porch. Appellant denied asking C.A. to perform oral sex that evening, stating: "No, I didn't. We

had talked about it over the phone. I don't know if I could say that it happened that day."
(Tr. Vol. V at 768.)

{¶ 81} R.C. 2907.07(A) does not specify that it requires in-person solicitation. Under the facts of this case, however, we need not decide whether a conviction, pursuant to R.C. 2907.07(A), requires in-person solicitation. Here, appellant testified that he solicited C.A. using both the phone and in person.  C.A. testified regarding the events that occurred after appellant arrived on the porch, as follows:

> A. Then he said, If you're not going to do it, I can just leave.
>
> Q. And then what did you say?
>
> A. I said okay, and I stopped texting.
>
> Q. And then what?
>
> A. He asked me if he wanted to - - if I was going to pull it out
> or if he was.
>
> Q. Now, when he said are you going to do "it," are we still
> talking about the giving him head?
>
> A. Yes, ma'am.
>
> Q. And when you say who's going to pull "it" out, what's he
> talking about?
>
> * * *
>
> A. His penis.

(Tr. Vol. II at 191-92.)

{¶ 82} Given this testimony, the record contains evidence that appellant committed the crime of importuning by in-person solicitation after he arrived on the porch.  Further, the record supports the trial court's finding that the importuning offense was completed before the rape occurred.  Accordingly, the trial court did not err in refusing to merge the importuning and rape counts.

{¶ 83} Finally, appellant argues the trial court erred in imposing consecutive sentences by failing to consider the statutory factor of proportionality.

{¶ 84} As noted under the facts, the trial court sentenced appellant to an indefinite term of 10 years to life imprisonment for rape, an additional consecutive 3 years for the

repeat violent offender specification, and 24 months for importuning, to be served consecutively. Further, the trial court ordered the sentence in this case to be served consecutive to the sentence in case No. 14CR-1733, in which appellant was convicted of two counts of aggravated burglary and one count of intimidation of a crime victim or witness.

{¶ 85} R.C. 2929.14(C)(4) provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 86} Thus, pursuant to R.C. 2929.14(C)(4), before imposing consecutive sentences the trial court is required to find "that (1) consecutive sentences are necessary to protect the public from future crime *or* to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the subsections (a), (b) or (c) applies." (Emphasis sic.) *State v. Price*, 10th Dist. No. 13AP-1088, 2014-Ohio-4696, ¶ 31, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177. When imposing consecutive sentences, a trial court must make the required findings at the sentencing hearing and

incorporate those findings into its sentencing entry. *Bonnell* at ¶ 37. However, the trial court is not required to state its reasons that support its findings and the court is not "required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id.* A trial court's inadvertent failure to make its findings in the sentencing entry is merely a clerical error that may be corrected by a nunc pro tunc entry. However, a "nunc pro tunc entry cannot cure the failure to make the required findings at the time of imposing sentence." *Id.* at ¶ 30.

{¶ 87} In determining compliance with R.C. 2929.14(C)(4), we must examine whether "(1) the trial court engaged in the correct analysis, and (2) the record contains evidence to support the findings of the trial court." *State v. Knowles*, 10th Dist. No. 16AP-345, 2016-Ohio-8540, ¶ 41, citing *State v. Dennison*, 10th Dist. No. 14AP-486, 2015-Ohio-1135, ¶ 18, citing *Bonnell* at ¶ 29.

{¶ 88} In this case, the trial court stated during the sentencing hearing:

> The Court notes that the offender was on bail before trial or sentencing in Case No. 1733 when the offense in 3744 occurred.
>
> The Court further notes that the Defendant was prior - - had a prior adjudication of delinquency and a history of criminal convictions, noting the F1 agg robb out of 2009.
>
> The Court notes the Defendant failed to respond favorably in the past to a sanction imposed for criminal convictions, and that the injury to the victim in both cases, the robbery - - excuse me, the burglary and in the rape case, those victims suffered serious physical, psychological, and/or economic harm as a result of these offenses.
>
> The Court finally notes, as far as seriousness factors, finally, that the injury to the victim was worsened by the physical or mental condition or the age of the victim, noting the victim in 3744 was 12 years old at the time of the offense.
>
> * * *
>
> Finally, the Court will order the terms of incarceration ordered in 14CR-1733 and 14CR-3744 to run consecutive, noting the great harm, physical, psychological, and economic, suffered by the victims in both cases; that the Defendant has

an extensive criminal history; and that he was out on bond in 1733 when the rape and 3744 occurred.

(Dec. 8, 2015 Tr. at 27-29.)

{¶ 89} The trial court's sentencing entry provides, as follows:

Counts One and Two shall be served consecutively to each other. Said sentence shall be served consecutively to Case No. 14CR-1733.

Pursuant to R.C. 2929.14, the Court finds that the shortest prison terms would demean the seriousness of Defendant's conduct, and not adequately protect the public from future crime by the offender, noting Defendant's criminal history. The Court finds Defendant is the worst form of offender, who poses the greatest risk of recidivism, noting the offenses committed in 14cr3744 occurred while Defendant was out on bond in 14cr733.

Further, Consecutive sentences are necessary to protect the public from future crime by Defendant. Consecutive sentences are not disproportionate to the seriousness of Defendant's conduct and to the danger Defendant poses to the public. The Court further finds that the psychological harm caused to Defendant's victims by the multiple offenses in 14cr1733 and 14cr3744 was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of Defendant's conduct, and that Defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime.

(Sept. 22, 2015 Jgmt. Entry at 2-3.)

{¶ 90} Appellant argues that the trial court did not make a finding that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. After thoroughly reviewing the record of the sentencing hearing, we cannot discern whether the trial court made the required proportionality finding. In reaching this conclusion, we are mindful that the trial court need not engage in a talismanic recitation of the statutory language. *Bonnell* at ¶ 37. However, where a reviewing court cannot discern from the record whether or not the trial court engaged in the correct analysis, the trial court's imposition of consecutive sentences cannot be upheld. *Id.* at ¶ 29.

{¶ 91} In *Bonnell* at ¶ 33, the Supreme Court stated:

> We can discern from the trial court's statement that Bonnell had "shown very little respect for society and the rules of society" that it found a need to protect the public from future crime or to punish Bonnell. We also can conclude that the court found that Bonnell's "atrocious" record related to a history of criminal conduct that demonstrated the need for consecutive sentences to protect the public from future crime. But it never addressed the *proportionality* of consecutive sentences to the seriousness of Bonnell's conduct and the danger he posed to the public, which in this case involved an aggregate sentence of eight years and five months in prison for taking $117 in change from vending machines.

(Emphasis added.)

{¶ 92} The court concluded that the trial court's "description of Bonnell's criminal record as atrocious and its notation of his lack of respect for society do not permit us to conclude that the trial court had made the mandated statutory findings in accordance with R.C. 2929.14(C)(4)." *Id.* at ¶ 34.

{¶ 93} Similar to *Bonnell*, the trial court in the instant case found that appellant was on bail in another case when he committed the offenses in this case, that he had a prior conviction for aggravated robbery, that he failed to respond favorably in the past to a sanction imposed for criminal convictions, and that the injury to the victims in the burglary and rape cases were serious physical, psychological, and/or economic harm which was increased by the victim's young age in the rape case. These comments relate to the findings required by R.C. 2929.14(C), and address appellant's history of criminal conduct as well as the need to protect the public from future crime. Pursuant to *Bonnell*, however, we cannot conclude the trial court made the proportionality finding required by R.C. 2929.14(C)(4). Moreover, the trial court made its comments in the context of imposing the sentence in this case consecutive to the sentence in case No. 14CR-1733, and not in the context of imposing consecutive sentences for importuning and rape. The trial court's failure to make all of the required findings for imposition of consecutive sentences render's appellant's sentence contrary to law.

{¶ 94} Having determined that the trial court failed to make the requisite findings under R.C. 2929.14(C), remand is necessary for the trial court " 'to consider whether consecutive sentences are appropriate, pursuant to R.C. 2929.14(C)(4), and, if so, to make

the proper findings on the record at the sentencing hearing and incorporate those findings into its sentencing entry.' " *State v. J.H.S.,* 10th Dist. No. 14AP-399, 2015-Ohio-254, ¶ 18, quoting *State v. Jones*, 10th Dist. No. 14AP-80, 2014-Ohio-3740, ¶ 18, citing *Bonnell.* Appellant's fourth assignment of error is sustained in part and overruled in part.

{¶ 95} Based on the foregoing, appellant's first, second, and third assignments of error are overruled, and his fourth assignment of error is sustained in part and overruled in part. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this cause is remanded to that court for resentencing.

*Judgment affirmed in part and reversed in part; cause remanded.*

KLATT and SADLER, JJ., concur.

_____