[Cite as *In re T.S.*, 2026-Ohio-2050.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of:                          :

[T.S.,                                     :          Nos. 24AP-328
                                                        and 24AP-701
              Appellant].                  :          (C.P.C. No. 23JU-9382)

                                           :          (REGULAR CALENDAR)

                                           :

———————————————————————————

D E C I S I O N

Rendered on June 2, 2026

———————————————————————————

**On brief**: *Shayla D. Favor*, Prosecuting Attorney, and *Jeffrey D. Devereaux*, for appellee.

**On brief:** *Mitchell A. Williams*, Public Defender, and *Timothy E. Pierce*, for appellant.

———————————————————————————

APPEALS from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

EDELSTEIN, J.

{¶ 1}   Appellant, T.S., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, adjudicating her a delinquent minor for committing the offense of assault.  For the reasons that follow, we affirm.

## I.  FACTS AND PROCEDURAL OVERVIEW

{¶ 2}   On September 17, 2023, plaintiff-appellee, the State of Ohio, filed a complaint alleging T.S. was a delinquent juvenile for committing one count of assault in violation of R.C. 2903.13(A).  Specifically, the state alleged that on September 16, 2023, T.S. and her cousin, C.E., got into a physical altercation with another minor, M.S., outside a restaurant and movie theater in Grove City, Franklin County, Ohio.  At that time, T.S. was 12 years old; C.E. and M.S. were both 14 years old and attended school together.  As described more fully

below, the altercation arose because T.S. was upset about something M.S. had posted on social media earlier that year.  T.S. denied the charge and the juvenile court referred the case to a magistrate pursuant to Juv.R. 40.

{¶ 3}    The state also filed a delinquency complaint against C.E. in a separate case, Franklin C.P. No. 23JU-9381, in connection with the September 2023 assault of M.S. Because T.S. and C.E.'s juvenile matters were never joined by the juvenile court, they were heard separately.  Juvenile Court Magistrate Terrance K. Scott presided over C.E.'s contested adjudicatory hearing[1] in March 2024, ultimately adjudicating her delinquent for committing the offense of assault.  He was also scheduled to preside over T.S.'s contested adjudicatory hearing in April 2024.

{¶ 4}    On April 2, 2024, the parties appeared before Magistrate Scott for the scheduled adjudicatory hearing.  At that hearing, T.S.'s counsel orally requested Magistrate Scott voluntarily agree to have the case transferred to a different magistrate on account of his involvement in C.E.'s March 2024 adjudication and indicated she intended to file a written motion requesting the same.  (Apr. 2, 2024 Hearing Tr. at 3-4.)  Specifically, T.S.'s trial counsel argued that because Magistrate Scott had heard testimony, received evidence, and rendered a decision in C.E.'s case, continuing to preside over T.S.'s case would be "unduly prejudicial" to T.S. and could result in "objectionable and appealable issues." (Apr. 2, 2024 Hearing Tr. at 3-4.)  Magistrate Scott declined to voluntarily transfer the case, instead staying the matter pending the juvenile court's ruling on T.S.'s forthcoming written motion for disqualification.

{¶ 5}    On April 10, 2024, T.S. filed her written motion to disqualify Magistrate Scott from presiding over her contested hearing "for bias and other cause" under Juv.R. 40(D)(6)

---

[1] Regarding the terminology used in the case below, on appeal, and in this decision, it is important to note that juvenile delinquency proceedings are distinct from adult criminal cases. This is because " '[j]uvenile law and criminal law are not synonymous.' " *State v. Smith*, 2022-Ohio-274, ¶ 2, quoting *State v. Hand*, 2016-Ohio-5504, ¶ 13. As the Supreme Court of Ohio has explained, "[i]n the statutory scheme for juvenile justice, '[i]nstead of "defendants," children are "respondents" or simply "juveniles"; instead of a trial, children receive "hearings"; children are not found guilty, they are "adjudicated delinquent"; and instead of sentencing, children's cases are terminated through "disposition." ' " *Smith* at ¶ 1, quoting *State v. Hanning*, 89 Ohio St.3d 86, 89  (2000). Here, the parties and the juvenile court judge refer to T.S. and C.E. as "co-defendants." For purposes of this case and our decision, we understand and recognize the term "co-defendants" is a metonymy—that is, a general reference to the related nature of T.S. and C.E.'s juvenile matters stemming from the same incident. We likewise understand the term "trial" as referring to the presentation of evidence in support of the assault offense that resulted in T.S.'s delinquent adjudication.

with the juvenile court.  (*See* Apr. 10, 2024 Mot. at 1-2.)  In that motion, T.S. argued that permitting the same magistrate to preside over two separate contested hearings involving juveniles charged in connection with the same incident would be highly prejudicial, a violation of her due process rights, and could create the appearance of bias sufficient to undermine public confidence in the integrity of the judicial system.  The state filed no response to her motion.

{¶ 6}  On April 18, 2024, the parties appeared before the juvenile court judge for a hearing on that motion.  At the hearing, T.S.'s trial counsel contended the state "agree[d] with and [did] not oppose" T.S.'s motion to assign a different magistrate to preside over her contested hearing.  (Apr. 18, 2024 Mot. Hearing Tr. at 3.)  Although T.S. and C.E.'s cases had been assigned to the same juvenile court judge, T.S.'s counsel emphasized that joinder of the two cases for adjudication had not been requested by the state or ordered by the juvenile court.[2]  (*See* Apr. 18, 2024 Mot. Hearing Tr. at 7-10.)  Addressing the state's decision not to move for joinder or to respond to T.S.'s motion to disqualify the magistrate, the trial prosecutor explained:

> After the - - you - - you know, essentially, I - - I kind of thought that both of these cases might - - we might get a plea on both of these cases from the get[-]go. That didn't happen. We had the full [contested] trial on the first case with [C.E.] and then shortly thereafter and ***talking to my office, they said, you know, you should really bring this to the attention of [T.S.'s trial counsel] that there might be an issue if she's planning on going forward contested with her case as well***. I checked with [T.S.'s trial counsel], [T.S.] wanted to go contested as well. So, then I - - ***I brought it to her attention this might be an issue and that we might need a new Magistrate, thinking that that request would be granted and that we wouldn't be getting to this point,*** but that's kind of the background.

(Emphasis added.)  (Apr. 18, 2024 Mot. Hearing Tr. at 10.)

{¶ 7}  After hearing arguments from both parties on the issue, the juvenile court judge stated:

---

[2] We note there is no reference to joinder in the Rules of Juvenile Procedure, though neither party argues joinder is prohibited in juvenile court proceedings.

Well, I think if there was an issue, [it] is because the issue was created. I mean, it - - it happens any time there's co-defendants. They're all set before the same Magistrate, which if this were an issue in that however the case was going to be prosecuted, that's when the issue happened, when it was properly addressed before now, which is how you all got here now. I mean, it wasn't by happenstance. It was because it was never addressed.

So, I'll take it under advisement. As of now, it's set for trial [on April 18, 2024] at 1:30. It's overage, which is another issue. So, it will go forward at 1:30. I'll just let you all know before then who it's going forward before. So, I'll take this under advisement, but I think the issue was created because I don't - - either there's an issue in how we've done things historically or there was an issue that was created in that everyone was not on the same page to know that both of these were trials to make sure that it was set on the same day. So - - and that's how the issue was created. But the trial will be at 1:30 before someone because the case is overage. So, you all - - I'll make my decision before then for you all to know at 1:30 who you're in front of.

(Apr. 18, 2024 Mot. Hearing Tr. at 10-11.)

{¶ 8} Ultimately, the juvenile court declined to appoint a new magistrate to preside over T.S.'s contested hearing and denied T.S.'s motion for a continuance. The juvenile court found "none of the cases cited in [T.S.'s] Motion contain facts in any way analogous to the situation here." (Apr. 18, 2024 Jgmt. Entry at 2.) The juvenile court also cited to cases holding judicial recusal is not necessary "simply because [a judge] acquired knowledge of the facts during a prior proceeding."[3] (Apr. 18, 2024 Jgmt. Entry at 2, quoting *State v. D'Ambrosio*, 1993-Ohio-170, ¶ 23, and citing *In re Disqualification of Franks*, 2017-Ohio-321, ¶ 5.)

{¶ 9} T.S.'s contested adjudicatory hearing proceeded as scheduled before Magistrate Scott on April 18, 2024. Before opening arguments, T.S.'s counsel renewed her request for a continuance, arguing that permitting the matter to proceed before the same magistrate who presided over C.E.'s case in March would violate T.S.'s constitutional due process rights and her right to a fair trial before a "neutral and detached arbiter." (Apr. 18,

---

[3] Of course, "[t]he Ohio Supreme Court retains exclusive jurisdiction over the disqualification of judges of the courts of common pleas." *State v. Moore*, 2007-Ohio-7215, ¶ 18 (7th Dist.); R.C. 2701.03(A).

2024 Contested Hearing Tr. at 6-7.) On that issue, the trial prosecutor indicated he "was a little concerned about that potential issue" but would "defer to the Court." (Contested Hearing Tr. at 7-8.) The magistrate noted T.S.'s objection but denied the requested continuance. (Contested Hearing Tr. at 8.)

{¶ 10} At the adjudicatory hearing, the state presented testimony from M.S. (the minor victim of the assault), E.K. (M.S.'s friend and an eyewitness to the incident), and two responding officers from the Grove City Police Department. T.S. also exercised her right to testify on her own behalf. Following the presentation of all testimony and evidence, the magistrate orally announced his decision adjudicating T.S. a delinquent juvenile for committing the offense of assault, in violation of R.C. 2903.13(A), which would be a first-degree misdemeanor offense if committed by an adult. The magistrate immediately proceeded to disposition, ordering T.S. to issue a written letter of apology to the court, prohibiting T.S. from having contact with M.S., and holding the case open for a 90-day period.

{¶ 11} Finding no error of law or other defect on the face of the magistrate's decision, the juvenile court approved the magistrate's decision and adopted it as its own on April 26, 2024. Pursuant to Juv.R. 40(E)(2) and Civ.R. 52, T.S. moved for written findings of fact and conclusions of law, which were issued by the magistrate on July 30, 2024.

{¶ 12} T.S. timely filed objections to the magistrate's decision concerning her disqualification motion and adjudication. Specifically, T.S. asserted the magistrate erred in (1) denying her oral request for voluntary recusal; (2) denying her request for a continuance of the April 18, 2024 contested hearing so counsel could "pursue different options"—namely, filing a petition for disqualification with the Supreme Court of Ohio pursuant to R.C. 2701.03—in light of the juvenile court's denial of her motion for recusal earlier that day; and (3) finding her delinquent for committing the offense of assault.

{¶ 13} On September 26, 2024, the juvenile court conducted a hearing on T.S.'s objections. At that hearing, T.S. contended that, by hearing the facts related to the incident at C.E.'s contested adjudicatory hearing in March 2024, "it makes sense that [Magistrate Scott] would be attached to and invested in that prior decision, which would lead to a similar decision when presented similar facts regardless of the new cross-examination or defenses provided by [T.S.]" at her April 2024 contested hearing. (Sept. 26, 2024 Hearing

Tr. at 5.) T.S. posited it would be unlikely the magistrate would "not find [T.S.] delinquent when he had already previously found another child delinquent based on the same evidence regardless of whether or not defense counsel in - - in [T.S.'s] case had different argument and/or cross-examination than counsel on the previously heard case." (Sept. 26, 2024 Hearing Tr. at 5.) Notably, T.S.'s counsel did not contend Magistrate Scott actually said or did anything at T.S.'s contested hearing in April 2024 to suggest he was biased against T.S. or had made any prejudgments about T.S. based on information he heard at C.E.'s contested hearing. In response, the state argued Magistrate Scott was not required to recuse himself just because he had knowledge about the incident from his involvement in C.E.'s juvenile case, noting that nothing in the law generally prohibits a judicial officer from presiding over the cases of multiple parties who are involved in the same incident. (*See* Sept. 26, 2024 Hearing Tr. at 6-9.) The parties also addressed T.S.'s objection to her delinquency adjudication.

{¶ 14} On November 15, 2024, the juvenile court issued a written decision and judgment entry overruling all of T.S.'s objections. Regarding Magistrate Scott's refusal to voluntarily recuse from T.S.'s case, as requested at the April 2, 2024 hearing, the juvenile court incorporated its reasoning from the April 18, 2024 judgment denying T.S.'s motion for recusal and found no error in the magistrate's decision not to voluntarily recuse from her case. The juvenile court likewise found no error in the magistrate's denial of T.S.'s request to continue the contested adjudicatory hearing so she could file an affidavit of disqualification with the Supreme Court. And in considering T.S.'s challenge to the sufficiency of the evidence supporting the magistrate's delinquency adjudication for the offense of assault, the juvenile court noted T.S. failed to argue any legal or factual basis for her objection. In any event, the court found testimony from the victim, an eyewitness, and the responding police officers, in addition to a video depicting the altercation, adequately supported T.S.'s delinquency adjudication. Accordingly, the juvenile court affirmed its April 26, 2024 judgment adopting the magistrate's decision adjudicating T.S. as a delinquent juvenile for committing the offense of assault.

{¶ 15} T.S. now appeals from that judgment and raises the following three assignments of error for our review:

[I.] THE COMMON PLEAS COURT JUDGE ERRED BY FAILING TO REMOVE THE JUVENILE MAGISTRATE FROM [T.S.'S] CASE AND REASSIGNING THE CASE TO ANOTHER MAGISTRATE. THE COMMON PLEAS COURT JUDGE'S ACTIONS VIOLATED [T.S.'S] RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS [TO] THE UNITED STATES CONSTITUTION, ARTICLE I, SECTIONS 1, 10, AND 16 OF THE OHIO CONSTITUTION, JUV. R. 1(B)(1), JUV. R. 40(D)(3)(B), [AND] JUV. R. 40(D)(6)[.]

[II.] THE COMMON PLEAS COURT JUDGE AND MAGISTRATE CAUSED STRUCTURAL ERROR TO OCCUR BECAUSE THEIR ACTIONS UNDERMINED T.S.'S RIGHT TO A FAIR TRIAL AND VIOLATED HER RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS [TO] THE UNITED STATES CONSTITUTION, JUV. R. 1(B)(1), JUV. R. 40(D)(3)(B), AND JUV. R. 40(D)(6)[.]

[III.] THE DECISION FINDING T.S. DELINQUENT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND RAN AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

## II.  LEGAL ANALYSIS

### A. First and Second Assignments of Error: Denial of Motion to Disqualify Magistrate

{¶ 16}  T.S.'s first and second assignments of error take issue with the juvenile court's denial of her motion to disqualify Magistrate Scott from presiding over her contested hearing since he presided over C.E.'s contested hearing the month before.  In her first assignment of error, T.S. contends the juvenile court erred in denying her motion to disqualify the magistrate after conducting a hearing on the motion.  In the alternative, T.S. argues in her second assignment of error that permitting the same magistrate who presided over C.E.'s contested hearing in March 2024 to preside over her contested hearing in April 2024 resulted in structural error.  Because a finding of structural error would mandate a finding of per se prejudice and result in automatic reversal, we will review T.S.'s second assignment of error first.

{¶ 17}  "Disqualification of a magistrate for bias or other cause is within the discretion of the court and may be sought by motion filed with the court." Juv.R. 40(D)(6). Although this court cannot review matters related to disqualification of a trial court ***judge***,

"removal of a magistrate falls within the discretion of the judge who referred the matter to the magistrate." (Emphasis added.) *Ashley v. Kevin O'Brien & Assoc. Co. LPA*, 2023-Ohio-4677, ¶ 46 (10th Dist.), citing *In re Disqualification of Wilson*, 77 Ohio St.3d 1250, 1251 (1996).

### 1. Second Assignment of Error: Structural Error

{¶ 18} "Even though they are labeled 'civil,' juvenile delinquency proceedings feature inherently criminal aspects that cannot be ignored." *In re D.S.*, 2006-Ohio-5851, ¶ 17. As such, due process and the right to a fair trial apply to juvenile proceedings. *See, e.g.*, *In re C.S.*, 2007-Ohio-4919, ¶ 68-82. In her second assignment of error, T.S. contends that permitting the same magistrate to hear evidence against multiple juveniles involved in the same incident through separate contested adjudicatory hearings violated these constitutional rights and, thus, was structural error. We disagree.

{¶ 19} A structural error is a constitutional defect that affects the framework within which the trial proceeds, rather than simply being an error in the trial process itself. *See, e.g.*, *State v. Jones*, 2020-Ohio-3051, ¶ 2. " ' " 'Errors of this type are so intrinsically harmful as to require automatic reversal (i.e., "affect substantial rights") without regard to their effect on the outcome.' " ' " *State v. Bond*, 2022-Ohio-4150, ¶ 7, quoting *Jones* at ¶ 20, quoting *State v. Hill*, 92 Ohio St.3d 191, 196 (2001), quoting *Neder v. United States*, 527 U.S. 1, 7 (1999).

{¶ 20} In this case, T.S. maintains she "possessed reasonable ***concerns*** and ***questions*** relative to the magistrate's objectivity in deciding her case at trial having already found delinquent [her] codefendant." (Emphasis added.) (Appellant's Brief at 43.) T.S. argues "[t]his created at a minimum the appearance of impropriety of [Magistrate Scott] presiding over [her] trial, which was exacerbated by the magistrate's refusal on the record to address, answer, and allay [T.S.'s] allegations questioning his impartiality, and the court's failure to require him to do so." (Appellant's Brief at 43.) T.S. posits that even if Magistrate Scott had expressly disclaimed his impartiality—which, we note, was never explicitly requested—such disclaimer would still be inconsequential because Magistrate Scott's involvement in C.E.'s contested hearing, which resulted in her being found delinquent, "created an appearance of impropriety of him deciding T.S.'s case which in turn caused structural error to occur at T.S.'s trial." (Appellant's Brief at 44.)

{¶ 21} In support of her structural error argument, T.S. cites cases questioning a trial court judge's ability to be impartial in criminal **contempt** proceedings where a defendant's conduct **in front of** or **toward** that particular judge formed the basis for the defendant's contempt charges. (*See* Appellant's Brief at 44-45, citing *In re Murchison*, 349 U.S. 133 (1955), *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971), and *Taylor v. Hayes*, 418 U.S. 488, 501 (1974).) However, here, Magistrate Scott was neither a witness to nor a victim of the assault offense that was the subject of the contested hearings before him. *Compare Murchison* at 137-39 (trial court judge placing his own observations about the defendant's "insolent" attitude during the original trial in the defendant's subsequent contempt trial); and *Mayberry* at 465 (where the defendant lodged numerous "highly personal aspersions, even 'fighting words' " against the trial court judge—including calling the judge a "dirty sonofabitch," "dirty tyrannical old dog," "stumbling dog," and "fool," telling the judge to "[go] to hell," and accusing the judge of bias, among other things—due process required another judge to preside over resultant criminal contempt proceedings).

{¶ 22} As a judicial officer, "[a] magistrate is presumed not to harbor bias or prejudice against a party, so the party alleging bias must set forth evidence to overcome the presumption of integrity." *Powell v. Lawson*, 2019-Ohio-4993, ¶ 9 (10th Dist.), citing *Melick v. Melick*, 2013-Ohio-1418, ¶ 9 (9th Dist.). "In the absence of a personal or pecuniary conflict, or other conduct suggestive of bias, the presumption is that the magistrate performed his duties faithfully and according to law." *State v. Morgan*, 55 Ohio App.3d 182, 184 (3d Dist. 1988). *See also In re Disqualification of Olivito*, 74 Ohio St.3d 1261, 1263 (1994). "A magistrate is biased or prejudiced against a party if [the magistrate] harbors 'a hostile feeling or spirit of ill will . . . toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the [magistrate], as contradistinguished from an open state of mind which will be governed by the law and the facts.' " *Angus v. Angus*, 2016-Ohio-7789, ¶ 22 (10th Dist.), quoting S*tate ex rel. Pratt v. Weygandt*, 164 Ohio St. 463 (1956), paragraph four of the syllabus.

{¶ 23} In this case, T.S. posits Magistrate Scott **may** have been biased or prejudiced against her because of his earlier participation in the contested adjudicatory hearing of C.E. This is not, of course, an allegation of personal misconduct or bias against T.S. Instead, T.S.'s argument concerns information acquired by the magistrate as a result of prior judicial

proceedings involving another party related to the same incident. T.S. also does not claim Magistrate Scott had **personal knowledge**—that is, knowledge acquired from extrajudicial sources—about the facts of her case. Nor does T.S. allege Magistrate Scott said or did anything at her contested hearing to suggest he held any prejudgments about her case or had any bias against her. Ultimately, T.S. takes issue with the **possibility** that, by presiding over C.E.'s contested hearing and adjudicating C.E. delinquent in March 2024, Magistrate Scott **could** have prejudged T.S.'s delinquency before receiving evidence and testimony at T.S.'s April 2024 contested adjudicatory hearing regarding the same incident.

{¶ 24} We do not take this potential risk lightly. To that end, we recognize it is possible some of the witnesses who testified at C.E.'s hearing may not have appeared and testified at T.S.'s hearing a month later. Similarly, some of the evidence presented at C.E.'s hearing may not have been admissible at T.S.'s hearing for any number of reasons. Had any of these circumstances arisen, there may very well have been real concerns about the magistrate's ability to act as a neutral and detached finder of fact when presiding over T.S.'s contested hearing. Thus, as a general matter, we believe assignment of a different magistrate, if feasible, to be prudent where juveniles subject to delinquency complaints for the same incident each proceed to separate contested adjudicatory hearings. Without such remedial action, there is a significant risk of injury to the constitutional rights of juveniles involved in the same incident. Nonetheless, we find no basis to conclude structural error occurred under the procedural posture and facts of this case.

{¶ 25} We begin by recognizing two fundamental principles of our judicial system: that a judicial officer is presumed not to confuse the evidence in one case with that in another and that a juvenile officer is capable of separating what may properly be considered from what may not be considered. *See, e.g.*, *Disqualification of Franks*, 2017-Ohio-321, at ¶ 5; *In re Yost*, 2018-Ohio-5257, ¶ 6. Accordingly, a judicial officer's participation in prior legal proceedings that involve related parties or issues is not, per se, a reason for recusal or disqualification. *See, e.g.*, *Boyd v. State*, 321 Md. 69, 79-86 (1990) (summarizing cases holding that a judge's participation in prior proceedings involving a co-defendant does not require recusal or disqualification); *Yost* at ¶ 6.

{¶ 26} It is, of course, important that the judicial process not only be fair, but that it **appear** to be fair. However, based on our review of the record in this case, we do not find

recusal was required to avoid the appearance of impropriety. Unlike the cases cited by T.S.—each of which supported the respective defendant's contention of a lingering trial court bias—there is nothing in the record before us to suggest Magistrate Scott was influenced by the testimony given in the previous case or by any findings he made based on testimony he heard at C.E.'s contested hearing when he adjudicated T.S. delinquent.

{¶ 27} Indeed, comparing the facts of the cases relied on by T.S. to the facts of this case illustrates why Magistrate Scott's prior involvement in C.E.'s case does not support a finding of structural error. In *People v. Gibson*, 90 Mich. App. 792 (1979) (*see* Appellant's Reply Brief at 8), the trial court judge explicitly stated during the bench trial of one defendant that his yet-to-be-tried co-defendant had committed the charged crime; this was found to constitute prejudgment warranting sua sponte recusal from the co-defendant's trial. *See id.* at 796-97. And in *People v. Robinson*, 18 Ill.App.3d 804 (1974) (Appellant's Reply Brief at 8), after hearing evidence about one defendant, the trial court judge reached conclusions about the other co-defendants' guilt and later affirmed his personal conviction that the co-defendants were guilty. *See id.* at 808. The reviewing court found the trial judge's denial of the co-defendants' motion for substitution of judge was error; however, the co-defendants' subsequent guilty pleas limited the impact of that holding. *See id.* T.S. also cites to *In re George G.*, 64 Md.App. 70 (1985), which involved allegations of "gang rape" by seven juvenile males. (Appellant's Reply Brief at 8.) After presiding over the bench trials of three of the juvenile co-respondents and concluding this was a non-consensual incident just three weeks earlier, the trial court judge stated during the fourth juvenile's trial that the juvenile "might be able to prove he is innocent." *Id.* at 81. The reviewing court found this statement suggested the judge's subconscious beliefs about the case, "caused an irreparable taint on the proceedings," and "project[ed] the *appearance* of bias" to such an extent that recusal was necessary. (Emphasis in original.) *See id.* at 81.

{¶ 28} In stark contrast here, nothing in the record before us suggests Magistrate Scott made any prejudgments about T.S.'s delinquency based on knowledge he acquired about the September 16, 2023 incident while presiding over C.E.'s contested hearing. Nor does anything in the record suggest Magistrate Scott was influenced by the testimony given in the previous case or that he relied on any findings he made in C.E.'s case when he adjudicated T.S. delinquent. And we have no reason to suspect Magistrate Scott held any

bias against or made any prejudgments about T.S. because of the testimony or evidence presented at C.E.'s contested hearing. Furthermore, because the transcript from C.E.'s contested hearing is not in the record before us, we have no knowledge of the statements Magistrate Scott made at that hearing or ability to compare the evidence and testimony presented in C.E.'s case with that which was presented at T.S.'s contested hearing. Based on the foregoing, we find no reason to conclude that bias or prejudice stemming from what Magistrate Scott learned at C.E.'s contested hearing played any role in his decision to adjudicate T.S. guilty in this case.

{¶ 29} To that end, the evidence before Magistrate Scott on the question of whether T.S. assaulted M.S. was compelling, as described more fully in our analysis of T.S.'s third assignment of error. M.S. testified T.S. punched her "a lot" of times and pulled her hair. (Contested Hearing Tr. at 16.) M.S. explicitly denied starting the fight. A video recording of the altercation (State's Exhibit A) and testimony from an eyewitness, E.K., corroborated M.S.'s account. (*See* Contested Hearing Tr. at 33-35.) Evidence presented at T.S.'s contested hearing established M.S. sustained a cut to her lip and bruising as a result of being repeatedly struck by T.S., thus satisfying the physical harm element of the offense. (*See*, *e.g.*, Contested Hearing Tr. at 20-21, 35-36, 55.) Further, T.S. admitted to fighting with M.S., though offered various justifications for her conduct. Given the considerable amount of evidence presented by the state at T.S.'s contested adjudicatory hearing showing T.S. knowingly caused or attempted to cause physical harm to M.S. on September 16, 2023, we have no reason to believe Magistrate Scott relied on evidence presented at C.E.'s hearing in order to adjudicate T.S. delinquent for committing assault. T.S.'s admission to repeatedly punching M.S. in the face and the video recording of the fight, in addition to the testimony of M.S. and E.K. about T.S. repeatedly striking M.S., clearly forecast the result that ensued.

{¶ 30} For these reasons, we find no basis to conclude Magistrate Scott's involvement in C.E.'s juvenile matter rises to the level necessary to find structural error under the facts and procedural posture of this case. That the magistrate may have learned of facts about the incident while presiding over C.E.'s contested hearing does not, alone, suggest "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). While, in some instances, a magistrate's involvement in a different juvenile's proceedings may necessitate recusal

under Juv.R. 40(D)(6) "for bias or other cause"—such that failure to recuse would result in structural error—we do not find here that permitting Magistrate Scott to preside over and adjudicate T.S.'s contested hearing shortly after presiding over C.E.'s contested hearing resulted in a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).

{¶ 31} Based on the foregoing, we overrule T.S.'s second assignment of error.

### 2. First Assignment of Error: Abuse of Discretion

{¶ 32} In her first assignment of error, T.S. contends the juvenile court erred in denying her motion to disqualify the magistrate and failing to assign her case to another magistrate. We disagree.

{¶ 33} "Disqualification of a magistrate for bias or other cause is within the discretion of the court and may be sought by motion filed with the court." Juv.R. 40(D)(6). We review a trial court's determination of matters related to the disqualification of a magistrate for an abuse of discretion. *See, e.g.*, *Angus*, 2016-Ohio-7789, at ¶ 16-18 (10th Dist.).

{¶ 34} An abuse of discretion occurs when the trial court's decision was unreasonable, arbitrary, or unconscionable. *See, e.g.*, *State v. Weaver*, 2022-Ohio-4371, ¶ 24, quoting *State v. Gondor*, 2006-Ohio-6679, ¶ 60, quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "A court abuses its discretion when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 2020-Ohio-6699, ¶ 19.

{¶ 35} "A decision is unreasonable if there is no sound reasoning process that would support the decision." (Internal quotations omitted.) *Fernando v. Fernando*, 2017-Ohio-9323, ¶ 7 (10th Dist.), quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). A decision is arbitrary if it is made "without consideration of or regard for facts [or] circumstances." (Internal quotations omitted.) *State v. Hill*, 2022-Ohio-4544, ¶ 9, quoting *State v. Beasley*, 2018-Ohio-16, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed. 2014). A decision may also be arbitrary if it lacks an adequate determining principle and is not governed by any fixed rules or standards. *See Beasley* at ¶ 12, citing *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359 (1981), quoting *Black's Law Dictionary* 96 (5th Ed. 1979). *See also Hackett* at

¶ 19. A decision is unconscionable if it "affronts the sense of justice, decency, or reasonableness." *Fernando* at ¶ 7, citing *Porter, Wright, Morris & Arthur, L.L.P. v. Frutta Del Mondo, Ltd.*, 2008-Ohio-3567, ¶ 11 (10th Dist.). Further, "[a]n abuse of discretion may also be found where a trial court 'applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.' " *State v. Harris*, 2023-Ohio-3994, ¶ 73 (10th Dist.), quoting *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.), citing *Berger v. Mayfield Hts.*, 265 F.3d 399, 402 (6th Cir. 2001). *See also Bellamy v. Montgomery*, 2012-Ohio-4304, ¶ 7 (10th Dist.).

{¶ 36} On the other hand, we review questions of law de novo. *State v. Willig*, 2010-Ohio-2560, ¶ 14 (10th Dist.). De novo review requires us to independently analyze the record and give no deference to the trial court's decision. *Allen v. Marre*, 2026-Ohio-1186, ¶ 7 (10th Dist.), citing *Johnson v. Am. Italian Golf Assn. of Columbus*, 2018-Ohio-2100, ¶ 13 (10th Dist.).

{¶ 37} As stated above, knowledge obtained from judicial proceedings in another related case does not require per se recusal. *See, e.g.*, *Disqualification of Franks*, 2017-Ohio-321, at ¶ 5; *Yost*, 2018-Ohio-5257, at ¶ 6. Further, the law will not suppose a possibility of bias or prejudgment of a judicial officer who is already sworn to administer impartial justice and presumed to act with learned discernment in matters of the law and evaluating evidence. *See, e.g.*, *In re Disqualification of Harris*, 2020-Ohio-4933, ¶ 7; *Zibaie v. Zibaie*, 2024-Ohio-1140, ¶ 23 (10th Dist.); *State v. Morgan*, 55 Ohio App.3d 182, 184 (3d Dist. 1988); *Disqualification of Olivito*, 74 Ohio St.3d at 1263. Again, we find nothing in the record before us to undermine the general presumption that Magistrate Scott could and would separate information that may be considered from information that may not, or to suggest Magistrate Scott failed to do so in this case or was otherwise biased or prejudiced against T.S. by reason of his participation in C.E.'s contested hearing. To that end, at the September 26, 2024 hearing on T.S.'s objections to the magistrate's decision, T.S.'s counsel suggested the state generally presented the "same evidence" at both C.E. and T.S.'s contested hearings. (Sept. 26, 2024 Hearing Tr. at 5.) Further, as already described above, the evidence Magistrate Scott heard at T.S.'s contested hearing persuasively showed T.S. caused physical harm to M.S. M.S. testified she was repeatedly struck by T.S., which was corroborated by testimony from an eyewitness and a video recording of the fight.

Moreover, T.S. admitted to hitting M.S. multiple times.  True, T.S.'s testimony and her counsel's arguments alluded to various justifications for T.S.'s conduct.  (*See*, *e.g.*, Contested Hearing Tr. at 69 (T.S. testifying "I self-defensed myself"); Contested Hearing Tr. at 75 (T.S. testifying she "blacked out" when she was on top of M.S. and punching M.S. in the face); Contested Hearing Tr. at 82 (T.S.'s trial counsel arguing in closing remarks for a lesser-included offense "for engaging in mutual combat").)  But we have no reason to believe evidence or arguments relevant to justifying or otherwise mitigating T.S.'s conduct would have been presented at C.E.'s contested hearing—the transcript of which we again note is not in the record before us—but not at T.S.'s hearing.

{¶ 38}  T.S. also takes issue with Magistrate Scott's purported failure to explain or articulate his reasoning for remaining on the case and the juvenile court's failure to require him to do so.  (*See* Appellant's Brief at 32-41.)  In support, she cites cases involving a trial court ***judge's*** refusal to recuse themselves from a case.  Recall, however, that unlike a trial court judge, the issue of whether a magistrate should be disqualified from a case is "within the discretion of ***the court***" and can "be sought by motion filed ***with the court***." (Emphasis added.)  Juv.R. 40(D)(6).  Suffice it to say, then, that Magistrate Scott had no discretion in determining whether his involvement in C.E.'s contested hearing, alone, warranted disqualification.  Indeed, at the April 2, 2024 hearing where the disqualification issue was first raised by T.S., Magistrate Scott indicated he "look[ed] forward to finding [out] how - - how [T.S.'s motion to disqualify the magistrate] is gonna shape up."  (Apr. 2, 2024 Hearing Tr. at 4-5.)  Moreover, contrary to T.S.'s suggestion otherwise (*see* Appellant's Brief at 43), Magistrate Scott did not refuse to allay T.S.'s concerns about his impartiality insomuch as neither the juvenile court judge nor T.S.'s trial counsel explicitly requested him to do so.  And, T.S. has not provided this court with—nor have we found— any binding legal authority suggesting, under the facts and circumstances of this case, such disclaimer was required.

{¶ 39}  For these reasons, we find no impediment to or practical limitation on the ability of Magistrate Scott to do that which he is ordinarily presumed competent to do.  Nor do we find any statement of the magistrate that would remotely suggest he was unable to, or did not, consider T.S.'s case in a fair and impartial manner, uninfluenced by the prior proceedings in C.E.'s case.  Accordingly, we conclude the juvenile court did not abuse its

discretion in denying T.S.'s motion to disqualify Magistrate Scott or otherwise err in addressing the propriety of Magistrate Scott presiding over her April 18, 2024 contested adjudicatory hearing.

{¶ 40}  Based on the foregoing, we overrule T.S.'s first assignment of error.

### B. Third Assignment of Error: Insufficient Evidence and Manifest Weight

{¶ 41}  In her third assignment of error, T.S. argues the evidence presented at her contested hearing was insufficient to adjudicate her as delinquent for committing the offense of assault.  T.S. also contends her delinquency adjudication was against the manifest weight of the evidence.  For the following reasons, we disagree.

### 1.  Legal Standard and Standard of Review

{¶ 42}  Whether evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial.  *See*, *e.g.*, *State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.); *State v. Frazier*, 2007-Ohio-11, ¶ 7 (10th Dist.); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  We do not weigh the evidence but instead determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 43}  In evaluating a sufficiency challenge, we assume the state's witnesses testified truthfully and determine whether that testimony and any other evidence presented at trial satisfied each element of the offense.  *See State v. Watkins*, 2016-Ohio-8272, ¶ 31 (10th Dist.), quoting *State v. Hill*, 2008-Ohio-4257, ¶ 41 (10th Dist.).  Thus, evidence is sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt.  *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

{¶ 44}  In contrast, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion.  *See, e.g.*, *State v. Richey*, 2018-Ohio-3498, ¶ 50 (10th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11-13, citing *Thompkins* at 386-87.  "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis."  *State v.*

*Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.).  " '[W]eight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other.' "  *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), quoting *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *Thompkins* at 387.

{¶ 45}  When considering an appellant's claim that a conviction following a bench trial is against the manifest weight of the evidence, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *See, e.g., Sparre v. Ohio Dept. of Transp.*, 2013-Ohio-4153, ¶ 10 (10th Dist.); *Eastley* at ¶ 20; *Thompkins*, 78 Ohio St.3d at 387; *State v. Martin*, 2022-Ohio-4175, ¶ 26.

{¶ 46}  Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact.  *See, e.g., State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *Morris v. Ohio Dept. of Rehab. & Corr.*, 2021-Ohio-3803, ¶ 64 (10th Dist.), citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 2012-Ohio-1017, ¶ 31 (10th Dist.), citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).  The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.* at 80.

{¶ 47}  To reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution.  *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

### 2. Analysis

{¶ 48}  To adjudicate T.S. a delinquent juvenile for committing the offense of assault, in violation of R.C. 2903.13(A), which would be a first-degree misdemeanor offense if committed by an adult, the state had to prove T.S. knowingly caused or attempted to cause physical harm to another.

{¶ 49} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). In the absence of a defendant's admission, resolution of whether an individual acts knowingly is determined from all the surrounding facts and circumstances. *State v. Fielding*, 2014-Ohio-3105, ¶ 51 (10th Dist.); *State v. Henry*, 2018-Ohio-1128, ¶ 51 (10th Dist.). Thus, the test is subjective but usually is decided on objective criteria. *See State v. Perry*, 2025-Ohio-2054, ¶ 68 (10th Dist.). "Additionally, a defendant acts knowingly, when, although not intending the result, he or she is nevertheless aware that the result will probably occur." *State v. Anderson*, 2010-Ohio-5561, ¶ 13 (10th Dist.), citing *State v. Edwards*, 83 Ohio App.3d 357, 361 (10th Dist. 1992).

{¶ 50} R.C. 2901.01(A)(3) defines "physical harm" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." To secure a delinquency adjudication against T.S. for assaulting M.S., the state was not required to prove M.S. was ***actually*** harmed, only that T.S. attempted to cause her physical harm. *See* R.C. 2903.13(A).

{¶ 51} In this case, it was undisputed T.S. struck M.S. multiple times. And, on appeal, T.S. does not contend otherwise. As already described above, M.S. testified about being repeatedly struck by T.S., which was corroborated by testimony from the eyewitness, E.K., and a video recording of the fight, admitted as State's Exhibit A. Moreover, T.S. admitted to punching M.S. multiple times in the face. In any event, T.S. challenges the sufficiency and weight of the evidence supporting the delinquency finding, without much explanation. (*See* Appellant's Brief at 47-48.) As to the issue of whether T.S. knowingly caused or attempted to cause physical harm to M.S., the parties presented the following testimony and evidence at trial.

{¶ 52} M.S. testified that on September 16, 2023, she met up with friends, including E.K., to go to the movies. (Contested Hearing Tr. at 11-12.) The group decided to go inside a nearby restaurant while waiting for their other friends to arrive. (*See* Contested Hearing Tr. at 12-13.) M.S. left the restaurant when C.E. entered and indicated that T.S., who was standing outside, wanted to speak with M.S. (*See* Contested Hearing Tr. at 13.) Apparently, T.S. was upset about a social media post M.S. made several months prior expressing her

dislike for or otherwise disparaging "white girls." (*See* Contested Hearing Tr. at 13-16, 22-23, 26.)  After exchanging words with T.S. about the social media post, M.S. testified that "[C.E.] said, 'are you gonna scrap with her or not?' And I told her, I was like, 'no I'm not gonna fight her.  It [the social media post] was about a year ago.  It's a situation that we should not continue." (Contested Hearing Tr. at 14-15.)  M.S. testified she agreed to speak with T.S. outside but expressly stated she would not fight her.  (Contested Hearing Tr. at 15, 23-24.)  M.S. claimed that after pushing her hair back out of her face,  T.S. "came towards" her, "put her hands on [M.S.], and "things escalated." (Contested Hearing Tr. at 16, 23-25.)  M.S. admitted both girls were pulling each other's hair until T.S. got on top of M.S. and C.E. joined in the altercation.  (Contested Hearing Tr. at 16.)  M.S. testified T.S. punched her "a lot" of times, as reflected on the partial video recording of the fight played during the contested hearing, which showed T.S. punching M.S. in the face while M.S. was on the ground.  (*See* Contested Hearing Tr. at 16-17, 25, 27-28; State's Ex. A.)  Although M.S. maintained she did not start the fight, she admitted she fought back in self-defense. (Contested Hearing Tr. at 16-17, 21, 25-28.)  The fight ended when an adult passerby intervened and called police.  M.S. testified she sustained multiple cuts and lost hair from the altercation.  (Contested Hearing Tr. at 21.)

{¶ 53}  E.K., who was with M.S. and their group of friends at the time of the incident, testified about a girl calling out M.S.'s name while they were inside the restaurant. (Contested Hearing Tr. at 31-32.)  He recounted two girls calling M.S.'s name from outside of the restaurant and asking M.S. if she wanted to fight.  (Contested Hearing Tr. at 32-33.) E.K. testified M.S. expressly stated she would not fight but agreed to step outside and talk with them because "they were causing a scene."  (Contested Hearing Tr. at 32-33.) According to E.K., when M.S. stepped outside, T.S. struck M.S. first, causing a fight to ensue.  (*See* Contested Hearing Tr. at 33-34.)  From inside the restaurant, E.K. observed T.S. hit M.S., pull her hair, and punch her.  (*See* Contested Hearing Tr. at 34-35.)  Although E.K. maintained T.S. started the fight (*see* Contested Hearing Tr. at 33, 36-38), he admitted he saw M.S. holding onto T.S.'s hair and pull T.S. to the ground.  (Contested Hearing Tr. at 38-39.)  After the altercation, E.K. observed a cut on M.S.'s lip and bruises on her elbows and knees.  (Contested Hearing Tr. at 35-36.)

{¶ 54} Officers Aaron Collins and Blake Hunter of the Grove City Police Department responded to the scene later that evening, and both officers testified at the contested hearing. Officer Collins testified that T.S. and C.E. approached him at the scene and told him M.S. had challenged T.S. to a fight. (Contested Hearing Tr. at 44-45, 49-50.) Upon his arrival, Officer Hunter made contact with M.S., E.K., and other people in their group. Officer Hunter testified M.S. reported she had been assaulted by T.S. and C.E., which he believed to be true based on his observation of cuts and scrapes to her forearms. (*See* Contested Hearing Tr. at 54-55.) Officer Hunter testified M.S. told him T.S. started the fight, while admitting she had pulled T.S.'s hair, causing them both to fall to the ground and then tried "to punch and strike as well to get away." (*See* Contested Hearing Tr. at 56-60.) After speaking with each other comparing the accounts of all witnesses, the responding officers arrested T.S. and C.E. at the scene for assaulting M.S. Of note, Officer Collins testified T.S. gave him a different last name both before and after she was placed under arrest. (*See* Contested Hearing Tr. at 45-48.)

{¶ 55} In her trial testimony, T.S. provided a very different account. T.S. (who is white) described being upset by M.S.'s social media post "talking about white girls, how we shouldn't like be wearing what like we're wearing. Like wigs and stuff like that" and "just talking stuff about white girls." (Contested Hearing Tr. at 64-65. *See also* Contested Hearing Tr. at 71-72.) T.S. testified she believed M.S.'s post was racist and she "felt offended by it 'cause [M.S.] was my friend" and "I'm white." (Contested Hearing Tr. at 65. *See also* Contested Hearing Tr. at 72.) T.S. described texting M.S. to request she remove the post, but M.S. responded by calling her a "cracker," saying she was "gonna beat [T.S.] up when she sees [her]," and declining to remove her post. (Contested Hearing Tr. at 65. *See also* Contested Hearing Tr. at 77.) T.S. admitted to calling M.S. "the 'n' word" during the course of the girls' messaging because M.S. had called her a "cracker" and was "saying trash things about my race." (Contested Hearing Tr. at 68-69, 72-73.) Notably, however, T.S. did not present any of these messages as evidence at her contested adjudicatory hearing.

{¶ 56} As to the altercation itself, T.S. testified she saw M.S. hugging C.E. by the door of the restaurant M.S. and her friends were sitting in. (Contested Hearing Tr. at 67.) T.S. described seeing M.S. "mugging" her, and explained she "already knew that [M.S.] had animosity towards [her] over [the social media post incident]" and anticipated "it was

gonna be something because of what happened." (Contested Hearing Tr. at 67.) T.S. testified C.E. called T.S. over and when T.S. reached them, T.S. and M.S. exchanged words. (Contested Hearing Tr. at 67-68.) Specifically, T.S. claimed M.S. brought up their prior heated conversation about the social media post and indicated she was upset about T.S. calling her "the 'n' word." (Contested Hearing Tr. at 68-69.) T.S. testified she acted to defend herself because M.S. told T.S. she was "gonna have to fight [her]," "walked out pulling her hair up," and T.S. "knew [M.S.] ***was gonna*** attack [her]." (Emphasis added.) (Contested Hearing Tr. at 68-69.) T.S. explained that, when she saw M.S. pull her hair back, she took it as a sign that M.S. planned to fight her. (*See* Contested Hearing Tr. at 69-70.) Though, we note, M.S. expressly denied attempting to pull her hair back into a ponytail and testified she did not have a hair tie with her at that time. (*See* Contested Hearing Tr. at 24.) Notably, too, M.S.'s hair is not pulled back in the video footage depicting the fight. (*See* State's Ex. A.)

{¶ 57} T.S. admitted to fighting with M.S. (*See* Contested Hearing Tr. at 69-70.) Though, she also recounted M.S. punching her, pulling her hair, and pulling her to the ground. (Contested Hearing Tr. at 69-70, 77.) T.S. testified M.S. was "running her mouth while we were fighting" but claimed she "didn't really hear everything that was going on" and "didn't see anything that was going on because [she] was in the middle of trying to like self defense myself." (Contested Hearing Tr. at 70.) Despite watching the video recording of the fight and admitting it showed her punching M.S. in the face multiple times while M.S. was on the ground and unable to get away, T.S. maintained she acted in self-defense and further claimed she "was blacked out" and "didn't know what was goin' on." (Contested Hearing Tr. at 74-76.) Notwithstanding T.S.'s claims of self-defense and blackout, T.S.'s trial counsel did not argue for instructions on either defense in closing remarks. Instead, T.S.'s counsel argued that, if T.S. is found delinquent of anything, it should be "a lesser included offense of disorderly conduct for engaging in mutual combat." (Contested Hearing Tr. at 82.)

{¶ 58} Based on this evidence, the magistrate determined T.S. was delinquent for committing the offense of assault, a violation of R.C. 2903.13(A). In his written findings of fact, the magistrate indicated he was not persuaded by T.S.'s claim of "mutual combat" or her contention that M.S. wanted to fight based on M.S.'s purported attempt to pull back her

hair.  (*See* July 30, 2024 Mag.'s Findings of Fact and Conclusions of Law at 3.)  The magistrate further found M.S.'s offensive social media post was "not an affirmative defense or a justification for [T.S.'s] actions.  (July 30, 2024 Mag.'s Findings of Fact and Conclusions of Law at 3.)

{¶ 59} Viewing all evidence presented at the contested trial in the light most favorable to the state, as we must on a sufficiency of the evidence review, we find the evidence presented at trial was sufficient for a rational trier of fact to conclude that, on September 16, 2023, T.S. knowingly caused or attempted to cause physical harm—i.e., "any injury, illness, or other physiological impairment, regardless of its gravity or duration," R.C. 2901.01(A)(3)—to M.S. when she repeatedly punched M.S., pulled M.S.'s hair, pinned her to the ground, and continued striking her in the face after she was on the ground.

{¶ 60} Having found no merit to her sufficiency challenge, we next turn to T.S.'s contention that her delinquency adjudication for committing the offense of assault was against the manifest weight of the evidence.  In support of that challenge, T.S. contends M.S. and her friend, E.K., were not credible witnesses. We find her arguments unavailing, for the following reasons.

{¶ 61} Reversal on manifest weight grounds is not required merely because inconsistent evidence was presented.  *State v. Rankin*, 2011-Ohio-5131, ¶ 29 (10th Dist.).  *See also State v. J.E.C.*, 2013-Ohio-1909, ¶ 42 (10th Dist.).  Indeed, it is well-established that the finder of fact "may consider conflicting testimony from a witness in determining credibility and the persuasiveness of the account by either discounting or otherwise resolving the discrepancies." *Harris*, 2023-Ohio-3994, at ¶ 41 (10th Dist.), citing *State v. Taylor*, 2015-Ohio-2490, ¶ 34 (10th Dist.), citing *Midstate Educators Credit Union, Inc. v. Werner*, 2008-Ohio-641, ¶ 28 (10th Dist.).  " 'The finder of fact can accept all, part or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, and whether it is merely evidential or tends to prove the ultimate fact.' " *Petty*, 2017-Ohio-1062, at ¶ 63 (10th Dist.), quoting *State v. Mullins*, 2016-Ohio-8347, ¶ 39 (10th Dist.).  *See also State v. Mann*, 2011-Ohio-5286, ¶ 37 (10th Dist.), quoting *State v. Nivens*, 1996 Ohio App. LEXIS 2245, *7 (10th Dist. May 28, 1996) (" 'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' ").

{¶ 62} We acknowledge T.S. presented an account of events significantly different from what M.S. and E.K described. (*See* Appellant's Brief at 47-48.) And we note the video recording of the fight does not appear to depict the earlier portion of T.S.'s encounter with M.S. outside of the restaurant. (*See* Contested Hearing Tr. at 77.) Nonetheless, " 'where a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding . . . as being against the manifest weight of the evidence.' " *In re L.J.*, 2012-Ohio-1414, ¶ 21 (10th Dist.), quoting *In re Johnson*, 2005-Ohio-4389, ¶ 26 (10th Dist.).

{¶ 63} The magistrate, as the trier of fact in this case, was in the best position to consider the discrepancies in the testimony regarding the events that took place on September 16, 2023. The magistrate was also in the best position to evaluate the credibility of live testimony from M.S. and E.K., in contrast with the live testimony of T.S. The magistrate was likewise free to reject any implication by T.S.'s trial counsel that M.S. and E.K. were not credible witnesses or otherwise failed to provide truthful testimony.

{¶ 64} Based on our review of the record before us, we decline T.S.'s invitation to substitute our judgment for that of the court below in reviewing and adopting the magistrate's findings of fact concerning witness credibility or the weight to be afforded each witness's testimony. Further, we find no basis to conclude T.S.'s decision to remain at the scene to speak with law enforcement appreciably bore upon the issue of whether the state's evidence credibly proved T.S. knowingly caused M.S. to suffer some injury, irrespective of its gravity or duration, contrary to the assault statute. *See* R.C. 2901.01(A)(3) (defining "physical harm"). (*See* Appellant's Brief at 48-49.) Indeed, T.S. admitted as much when she testified at the contested hearing. Furthermore, T.S. does not attribute error on appeal to the lower court's evaluation of her trial counsel's mutual combat argument (for purposes of mitigating the assault offense to a lesser-included offense of disorderly conduct). For these reasons, we cannot say this is one of the rare cases where the trier of fact clearly lost its way in believing the state's witnesses and evidence when it found T.S. delinquent for committing assault and the juvenile court entered disposition against her.

{¶ 65} Finding no error in the juvenile court's adoption of the magistrate's adjudication of T.S. as a delinquent juvenile for committing the offense of assault, we overrule T.S.'s third assignment of error.

## III.  CONCLUSION

{¶ 66}  Having overruled T.S.'s three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BEATTY BLUNT and MENTEL, JJ., concur.

———————